United States Court of Appeals
Fifth Circuit

**F I L E D**

May 5, 2006

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 03-31208

TEXACO EXPLORATION AND PRODUCTION, INC.; MARATHON OIL COMPANY,

Plaintiffs-Appellants,

VERSUS

AMCLYDE ENGINEERED PRODUCTS COMPANY, INC.; ET AL.,

Defendants,

AMCLYDE ENGINEERED PRODUCTS COMPANY, INC.; UNITED DOMINION
INDUSTRIES, INC., formerly known as AMCA INTERNATIONAL CORP.,
formerly known as CLYDE DIVISION,

Defendants-Appellees.

CERTAIN UNDERWRITERS AT LLOYDS LONDON, Each for its own self and
not one for the other, jointly and not severally and each
subscribing to Policy No. S611625 and each for its own self and
not one for the other, jointly and not severally and each
subscribed to Policy No. S611626; ET AL.,

Plaintiffs-Appellants,

VERSUS

AMCLYDE ENGINEERED PRODUCTS, INC.; ET AL.,

Defendants,

AMCLYDE ENGINEERED PRODUCTS, INC.; AMCLYDE ENGINEERED PRODUCTS
COMPANY, INC.; UNITED DOMINION INDUSTRIES INC., formerly known as
AMCA INTERNATIONAL CORP., formerly known as CLYDE DIVISION; J RAY
MCDERMOTT INTERNATIONAL VESSELS, LTD.,

Defendants-Appellees.

Appeal from the United States District Court
For the Eastern District of Louisiana

Before JONES, Chief Judge, and JOLLY and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

This appeal arises out of an accident during the construction of the Petronius oil and gas production facility in the Gulf of Mexico. Addressing multiple issues raised in two actions consolidated for trial and appeal, we affirm in part, reverse in part, and remand for further proceedings. With respect to the products liability action arising from the loss of a portion of the Petronius compliant tower, we conclude that the district court erred in determining its subject matter jurisdiction and the applicable substantive law; and we reverse and remand. With respect to the insurance subrogation action and the attendant interpretation of the applicable insurance policy, we affirm the district court's grant of summary judgment based upon parties' entitlement to waiver of subrogation and affirm the dismissal of the subrogation claims. We also affirm the court's award of costs to AmClyde.

**FACTUAL BACKGROUND**

The two actions consolidated for trial and appeal, which for simplicity's sake we style the Texaco products liability action (or the "Texaco cause") and the Underwriters subrogation action (or the

2

"Underwriters cause"), are presented separately. Though no party raises an objection to the consolidation, we treat the actions separately here for clarity to the parties and to the district court on remand.

## I. Facts Leading to Texaco's Products Liability Action

Plaintiffs-Appellants Texaco Exploration and Production, Inc. and Marathon Oil Company (collectively, "Texaco") are the lessees of an offshore federal lease at Viosca Knoll Block 786 on the Outer Continental Shelf (or the "Shelf"). The lease block is located in approximately 1750 feet of water and is the site of Texaco's oil and gas development project, Petronius. The Petronius project was a $400 million deepwater drilling and production project for the development of 80 to 100 million barrels of oil equivalent. The compliant tower, the construction of which forms the basis of this dispute, is a platform, designed to flex with the forces of wave, wind, and current, that is fixed permanently to the Outer Continental Shelf. The Petronius compliant tower is approximately 1870 feet in height, weighs approximately 43,000 tons, and is capable of producing 60,000 barrels of oil and 100 million cubic feet of natural gas per day. *See Texaco and Marathon Move Forward on $400 Million Deepwater Project in Gulf of Mexico Compliant Tower Design Selected for "Petronius,"* BUSINESS WIRE, Sept. 17, 1996, *available at* LEXIS, News Library, BWire file.

During the 1998 construction of the Petronius compliant tower,

3

a main load line on a crane, which was mounted on the Derrick Barge 50 ("DB-50"), failed. The crane or load line failure caused the deck section that was then suspended (the "South Deck Module") to fall into the Gulf of Mexico on the Outer Continental Shelf off the coast of Alabama and Louisiana. The failure resulted in a complete loss of the South Deck Module and a fifteen-month delay to the construction project of the Petronius compliant tower affixed to the sea floor.

Prior to the initiation of construction, Texaco contracted with J. Ray McDermott, Inc. ("McDermott"). The contract charged McDermott with the engineering design, drafting, fabrication, installation, and construction of the Petronius compliant tower platform and its components, including the foundation piles, tower, support frame, two deck modules (the North Deck Module and the South Deck Module), and attendant drilling rigs at Viosca Knoll Block 786. The construction project proceeded in two phases using the DB-50 barge, which McDermott chartered and operated.[1] The DB-50 was owned by J. Ray McDermott International Vessels, Ltd. ("JRMIV").[2] The crane mounted to the DB-50 was manufactured by the predecessor to Defendant-Appellee AmClyde Engineered Products, Inc.

---

[1]Texaco and McDermott's construction contract called for McDermott's provision of the DB-50 or another suitable vessel.

[2]The parties make much of the quality and degree of distinction between JRMIV and McDermott. The entities are at a minimum affiliates, and we address this issue in greater detail with respect to the discussion of Underwriters' appeal.

Once construction of the compliant tower commenced, both the North and South Deck Modules (which were prefabricated off-site) were transported to the offshore construction site on the same material barge. On December 3, 1998, McDermott began installation of both modules onto the already-constructed support frame of the Petronius compliant tower. First, McDermott transported the heavier of the two, the North Deck Module, some 1500 feet from its storage location on the material barge to the support frame and installed it. McDermott then began installation of the South Deck Module. Between the initial lift of the South Deck Module from the material barge and its placement on the support frame, the crane's wire rope load line failed, dropping the South Deck Module to the sea floor.

## II. Facts Leading to Underwriters' Subrogation Action

Builder's Risk Underwriters (the "Underwriters") insured the Petronius compliant tower construction project, including the lost South Deck Module. The Builder's Risk Policy comprises a general conditions section, a section that covers physical damage, and a section that covers third party legal and contractual liabilities. Texaco was a principal, named assured under the policy.

Under the terms of the policy, Underwriters paid Texaco more than $72 million for covered losses, including the loss of the South Deck Module. Not included, however, in the policy's coverage

5

were the losses due to delayed production.[3]

## PROCEDURAL BACKGROUND

On December 2, 1999, Texaco sued, among others, AmClyde Engineered Products Company, Inc. ("AmClyde") and Friede Goldman Halter, Inc., successors to the designer and manufacturer of the Clyde Whirley 4000 Model 80 crane, in federal court, invoking federal question jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA" or the "Act"), 43 U.S.C. § 1331, and admiralty jurisdiction in the alternative. Texaco alleged multiple negligence and products liability causes of action, and alleged that the case should be governed by general admiralty law.[4] Texaco did not sue McDermott because their contract contained a binding arbitration clause.

In a separate action, Underwriters sued, among others, AmClyde, JRMIV, and the DB-50 *in rem*, seeking subrogation for amounts already paid to Texaco under the terms of the Builder's Risk Policy issued to Texaco as the principal assured, invoking admiralty jurisdiction under 28 U.S.C. § 1333. Underwriters did not sue McDermott because McDermott was a named additional assured

---

[3]Losses due to delay are expressly excluded from coverage under section one of the policy, which covers property damage. Builder's Risk Policy, at 14, ¶ 10(1)(c).

[4]Texaco alleged in part: (1) AmClyde's crane design was defective, rendering the crane unreasonably dangerous; (2) AmClyde failed to furnish McDermott with sufficient information regarding functioning limitations on the crane; and (3) AmClyde negligently maintained and inspected the crane.

6

under the Builder's Risk Policy with Texaco. The two actions, Texaco's products liability action and Underwriters' subrogation action, were consolidated on Underwriters' motion.

The defendants in Texaco's suit tendered McDermott as a third-party defendant pursuant to Federal Rule of Civil Procedure 14(c), and McDermott filed a summary judgment motion on the Rule 14(c) tendered claims. Texaco moved to stay all proceedings between itself and McDermott pending arbitration. The district court denied the stay and granted McDermott summary judgment. Texaco appealed the interlocutory order under 9 U.S.C. § 16(a)(1)(A). *See Texaco v. AmClyde*, 243 F.3d 906 (5th Cir. 2001) ("*Texaco I*"). On appeal, a panel of this Court reversed, staying litigation between Texaco and McDermott and vacating the summary judgment for McDermott. *Id*. at 912. The panel declined to create an exception to the Federal Arbitration Act, 9 U.S.C. § 3, to permit a third party, AmClyde, to nullify an arbitration clause that did not conflict with Rule 14(c). The panel remanded with instructions that a limited stay be entered between Texaco and McDermott and that Texaco's claims against other defendants proceed.[5] The *Texaco I* panel did not address the issues raised in the instant appeal.

On remand, the district court granted by written order dated October 13, 2000 a motion to strike Texaco's jury demand, noting

---

[5]Texaco and McDermott subsequently submitted to arbitration and resolved their dispute.

that admiralty law's application extinguished the jury trial right. In that order, the district court determined that no fact or allegation permitted the exercise of OCSLA jurisdiction because admiralty law alone governed and did not give rise to a jury trial right. On Underwriters' subrogation claim, the district court granted summary judgment to AmClyde on the grounds that it was an additional insured under the Builder's Risk Policy, entitled to waiver of subrogation. The court granted AmClyde defense costs under that same policy.

The case proceeded to bench trial on Texaco's products liability claim for twenty-four days. The district court issued its liability findings in an oral opinion and entered a written order of judgment. The court found that Texaco had failed to sustain its burden of proof with respect to liability against all defendants except McDermott. The court concluded that JRMIV was liable to Texaco and Underwriters for unseaworthiness of the DB-50 because of the crane load line's failure and in the alternative, that McDermott's negligence in caring for and inspecting the wire rope was a superseding cause.

JRMIV moved to dismiss Underwriters' subrogation action based upon the policy language and to vacate the court's earlier finding that JRMIV was partially liable to Texaco for the loss of the South Deck Module. The district court subsequently vacated its liability findings and entered summary judgment for JRMIV on the ground that JRMIV was an additional insured entitled to a waiver of subrogation

8

or, alternatively, that McDermott, as a bareboat charter, was solely responsible for the condition, maintenance, and operation of the DB-50 at all pertinent times, precluding liability against JRMIV for unseaworthiness.

**DISCUSSION**

Texaco and Underwriters separately appeal, arguing that the district court erred in multiple rulings. We hold the district court erred in determining it lacked jurisdiction under OCSLA. In light of that fundamental error, the court erred in applying substantive maritime law and in denying Texaco's demand for a jury trial. Based upon these errors, and because the denial of jury trial was not harmless error, we must vacate the district court's judgment for AmClyde and remand for further proceedings. With respect to the district court's summary judgment disposition of issues related to Underwriters' subrogation claims, we affirm.

## I. Texaco's Appeal

Texaco argues that the district court reversibly erred in granting the motion to strike Texaco's jury demand based upon the court's incorrect determination of its subject matter jurisdiction. According to Texaco, jurisdiction was properly grounded on OCSLA – which provides federal courts with jurisdiction over disputes arising from the development of minerals on the Outer Continental Shelf – in addition to the admiralty jurisdiction that the district court recognized, and Texaco further contends that these

9

overlapping admiralty and OCSLA jurisdictions result in the application of substantive maritime law and also give rise to a jury trial right that the district court improperly denied.

## A. Subject Matter Jurisdiction

## 1. OCSLA Jurisdiction Was Properly Invoked

The relevant portion of OCSLA's jurisdictional grant provides,

(b)(1) Except as provided in subsection (c) of this section, the district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals . . . .

43 U.S.C. § 1349(b)(1)(A).

The Act expressly grants subject matter jurisdiction to the federal courts over cases and controversies "arising out of or in connection with" any operation involving the "development" of minerals on the Outer Continental Shelf. *Id*. "Development" is defined by OCSLA as "those activities which take place following discovery of minerals in paying quantities, including geophysical activity, drilling, *platform construction*, and operation of all onshore support facilities, and which are for the purpose of ultimately producing the minerals discovered." § 1331(l) (emphasis added). Thus, the Act provides for federal subject matter jurisdiction over cases and controversies arising out of or in connection with any operation involving platform construction on the Outer Continental Shelf. *Id.*; § 1349(b)(1). Such federal

10

question jurisdiction under OCSLA is, by virtue of its express statutory provision, independent of any additional maritime basis for federal jurisdiction. *See* U.S. CONST. Art. III, § 2; 28 U.S.C. § 1333.

We have recognized that OCSLA's jurisdictional grant is broad, *Tenn. Gas Pipeline v. Houston Cas. Co.*, 87 F.3d 150, 154 (5th Cir. 1996), and that the Act covers "a wide range of activity occurring beyond the territorial waters of the states on the outer continental shelf of the United States," *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 495 (5th Cir. 2002). Continental shelf platform construction, such as the construction of the Petronius compliant tower giving rise to this action, is explicitly included within the OCSLA definition of "development." 43 U.S.C. § 1331(l); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1226-27 (5th Cir. 1987) (explaining that both the plain text and legislative history of OCSLA support federal jurisdiction over actions arising from development, in the form of platform construction, on the Outer Continental Shelf).

AmClyde counters that this controversy arises, instead, out of the traditional maritime conduct of transporting goods across navigable waters, which is beyond the reach of OCSLA. The district court concluded that Texaco's claims fall exclusively under the district court's admiralty jurisdiction and cannot, also or in the alternative, be grounded upon OCSLA's jurisdictional grant in §

11

1349(b)(1). The court determined that admiralty law exclusively applied, extinguishing a jury trial right. Citing *Baris v. Supicio Lines, Inc.*, 932 F.2d 1540, 1547 (5th Cir. 1991), and *Laredo*, 754 F.2d at 1229, the court concluded that admiralty law alone served as a basis for jurisdiction because its situs and nexus tests were satisfied and because the court rejected Texaco's invocation of the savings to suitors clause of 28 U.S.C. § 1333.

We agree with Texaco that the underlying facts and the nature of the torts alleged bring its cause of action within OCSLA's provisions for federal subject matter jurisdiction. *See* 43 U.S.C. § 1349(b)(1). At the time of the loss of the South Deck Module, the parties were undeniably involved in the development of the Outer Continental Shelf, as defined by the Act. The complaint pleads that on December 3, 1998, McDermott "was lifting the Petronius south deck module at a location on the Outer Continental Shelf adjacent to the Petronius compliant tower structure" when the load line failed, dropping the module into the sea and causing a total loss of the module, damages related to reconstruction, and delay to the platform construction and mineral development. Contrary to AmClyde's characterization on appeal, the undisputed facts demonstrate that traditional maritime transportation was complete at the time of the loss. The DB-50 was in position, had already installed the North Deck Module, and was lifting – not transporting – the South Deck Module into position for

12

installation. In submissions to the district court, AmClyde characterized the accident as occurring while McDermott lifted the deck module into place after having "successfully placed the north deck module," and in its Answer and Cross-Complaint, AmClyde referred repeatedly to the conduct at the time of the accident as "the Petronius module lift." The parties' own characterization of the events surrounding the loss of the South Deck Module reveals that Texaco's cause arises out of and in connection with the development of the Outer Continental Shelf. *See* § 1349(b)(1).

In *Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988), we held that OCSLA granted the district court subject matter jurisdiction over a plaintiff's claim that he was injured, while suspended and swinging from a fixed platform to a nearby vessel, when the rope that carried him broke. *Id*. at 368-69. OCSLA's jurisdiction extended to Recar's claim because his injury, "that occurred while he was overseeing the repair and maintenance of the platform, [arose] out of the production of minerals on the Outer Continental Shelf" and would not have occurred but for his maintenance of the platform. *Id*. at 369. Similarly, here, the harm alleged by Texaco arises directly from the construction of the Petronius compliant tower, a fixed platform expressly covered by OCSLA's terms, and would not have occurred but for the development of the Outer Continental Shelf in the form of the Petronius compliant tower's construction.

13

As stated earlier, this Circuit has consistently read OCSLA's jurisdictional grant broadly. *See Tenn. Gas Pipeline*, 87 F.3d at 156; *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994); *Recar*, 853 F.2d at 369. AmClyde's argument to the contrary is not availing. OCSLA's broad grant of jurisdiction to the federal courts over cases arising out of the development of the seabed is not curtailed simply because the South Deck Module was in motion at the time of the crane or wire rope's failure. The deck module was already at the development site and was merely being moved by crane from the materials barge into its place on the fixed compliant tower, rather than being transported point-to-point across the sea. The crane load line failure occurred during the construction of the compliant tower, after the successful installation of the North Deck Module. Texaco properly pled that the court exercised jurisdiction under OCSLA.

Our jurisdictional analysis does not conclude here, however, because Texaco also appeals the final judgment resulting from the court's application of substantive maritime law to the claims it deemed arose out of admiralty jurisdiction. In *Recar*, we expressly declined to address whether admiralty, in addition to OCSLA, provided a basis for the court's subject matter jurisdiction. 853 F.2d at 370 (noting the possibility that "the relationship of the alleged 'wrong' . . . to traditional maritime activity is sufficiently strong to characterize the wrong as a maritime tort

14

which requires application of general maritime law"). We must resolve whether two bases for jurisdiction overlap or whether OCSLA alone grants subject matter jurisdiction.

## 2. Admiralty Jurisdiction Was Not Properly Invoked

Texaco's complaint reveals that the alleged torts do not give rise to admiralty jurisdiction. In the first instance, Texaco invoked the court's OCSLA jurisdiction: "This Court has subject matter jurisdiction under [OCSLA]. The facts underlying the claim require the application of substantive general maritime law." In the alternative, Texaco averred that the court enjoyed admiralty jurisdiction over the claims. *See* 28 U.S.C. § 1333. In light of these mixed allegations of federal court jurisdiction, Texaco complained of (1) defective and unreasonably dangerous products design, including design of the crane's equalizer system, triggering strict liability; (2) negligent failure to furnish sufficient information regarding operating limitations to the barge's owner; (3) negligent failure to maintain, inspect and/or remedy the crane's defects; (4) negligent failure to alert Texaco to a known danger with respect to the crane; (5) negligent failure to prevent the construction project from proceeding with knowledge of the crane's defects; (6) defective and unreasonably dangerous condition of the wire rope that was furnished with improper, defective, or inadequate lubrication, making it unreasonably susceptible to corrosion; (7) negligent provision of unmatching

15

port and starboard load lines; and (8) negligent failure to detect deficiencies of the crane and wire rope during a test lift and inspection or a failure to warn if the deficiencies were detected.

Admiralty jurisdiction is determined by a two part test of (1) location and (2) connection with maritime activity. *Sisson v. Ruby*, 497 U.S. 358, 363 (1990). The location test is easily satisfied as the parties agree that the products liability and negligence torts alleged here occurred on navigable water. Therefore, our analysis must focus upon the connection test, which is less easily resolved on this record and which comprises two queries: (1) whether the type of incident involved has the potential to disrupt maritime commerce and (2) "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995); *Scarborough v. Clemco Indus.*, 391 F.3d 660, 663 (5th Cir. 2004).

Texaco's causes of action, which we have concluded are inextricably connected with the development of the Outer Continental Shelf and an installation for production of resources there, *see* 43 U.S.C. § 1333(a)(1), are insufficiently connected to traditional maritime activity to support the application of admiralty law. In *Grubart*, the connection to maritime activity was sufficient to trigger admiralty jurisdiction because the incident

16

was of a type potentially disruptive to maritime commerce and the general character of the activity was "substantially related to traditional maritime activity." *Grubart*, 513 U.S. at 538, 540. The complaint there alleged negligent weakening of a tunnel structure located underneath the riverbed, into which the defendant had contracted to install pilings. *Id*. at 529. The resultant connection to maritime activity was sufficient because the incident resulted from "damage by a vessel in navigable water to an underwater structure." *Id*. at 539. The general character of the activity was maritime in nature because the work giving rise to the claim was "repair or maintenance work on a navigable waterway performed from a vessel." *Id*. at 540.

The distinction between *Grubart* and the instant suit hinges upon the core factors relevant to the determination of maritime law's application. In *Grubart*, the damage was inextricably tied to the navigable waterway: the transportation and use of materials on water were directly connected to the repair and maintenance of a navigable waterway. *Id*. Texaco's complaint, on the other hand, arises not from traditionally maritime activities but from the development of the resources of the Outer Continental Shelf, and Texaco's complaint would not exist but for the construction of the Petronius compliant tower, an activity undeniably covered by OCSLA. To the extent that maritime activities surround the construction work underlying the complaint, any connection to maritime law is

17

eclipsed by the construction's connection to the development of the Outer Continental Shelf.

Therefore, the district court erred in determining the basis for its subject matter jurisdiction. The district court on remand exercises its jurisdiction granted by OCSLA, not admiralty jurisdiction.

## B. OCSLA's Choice of Law Provision Determines Applicable Law

Concluding that jurisdiction rested solely upon OCSLA, we now turn to the district court's denial of jury trial. Texaco argues that OCSLA's choice of law provision, *see* 43 U.S.C. § 1333, is not in dispute;[6] however, we must determine the applicable substantive law in order to address whether the denial of jury trial was reversible error. According to Texaco, its complaint combines a maritime claim with a non-maritime basis for jurisdiction and this combination creates a Seventh Amendment right to jury trial, the denial of which was reversible error. According to AmClyde's alternative position,[7] in the event of overlapping jurisdiction — grounded upon both OCSLA and admiralty — substantive maritime law

---

[6]Indeed, we agree with Texaco that in determining whether OCSLA grants subject matter jurisdiction, the statute's choice of law provision is not at issue. But here, Texaco also challenges the denial of jury trial and, relatedly, the district court's judgment for AmClyde. This second challenge requires review of the district court's application of maritime law to Texaco's claims against AmClyde.

[7]We have rejected AmClyde's primary argument that the sole basis for subject matter jurisdiction is admiralty.

18

applies and prevents a right to jury trial. We disagree with both parties' positions. As we explain next, OCSLA does not permit the application of substantive maritime law to Texaco's action.

Both parties merely assume that maritime law controls this defective product design and negligence action, citing only dicta for the proposition that where OCSLA and admiralty jurisdiction overlap, maritime law applies. *See Laredo*, 754 F.2d at 1229.[8] Our caselaw has not squarely resolved whether maritime law applies of its own force to a products liability tort occurring during and as a result of the construction of a fixed compliant tower on the Outer Continental Shelf. We may not rely upon the parties' bare conclusion that substantive maritime law applies because OCSLA provides its own choice of law rules.

OCSLA extends federal law to the Outer Continental Shelf and borrows adjacent state law as a gap-filler. 43 U.S.C. § 1333. "To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations . . . the

---

[8]The parties' conclusion that maritime law applies to the merits of the claim likely stems from the Contract for Engineering, Fabrication and Installation that contains a choice of law provision, identifying the General Maritime Law of the United States as the applicable law. As we explain, under OCSLA, the Contract's choice of law provision is of no moment because the parties' choice of law will not trump the choice of laws scheme provided by Congress in OCSLA. *See Gulf Offshore Co. v. Mobil Oil* Corp., 453 U.S. 473, 485 (1981); *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1050 (5th Cir.), *cert. denied*, 498 U.S. 848 (1990); *Matte v. Zapata Offshore Co.*, 784 F.2d 628, 631 (5th Cir. 1986). Moreover, AmClyde was not a party to the Contract for Engineering, Fabrication and Installation.

civil and criminal laws of each adjacent State . . . are hereby declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon."  § 1333(a)(2)(A).

> [OCSLA] proclaims that [fixed platforms on the Outer Continental shelf] are federal enclaves and any dispute arising on them is to be resolved by resort to the laws of the adjacent state which, 'to the extent that they are applicable and not inconsistent with [OCSLA] or with other Federal laws and regulations . . . are . . . declared to be the law of the United States. . . .' 43 U.S.C. § 1333(a)(2)(A).

*Matte v. Zapata Offshore Co.*, 784 F.2d 628, 630 (5th Cir. 1986).

These statutory choice of law rules are not subject to exception by the parties' agreement.  *Gulf Offshore Co. v. Mobil Oil* Corp., 453 U.S. 473, 485 (1981); *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1050 (5th Cir.), *cert. denied*, 498 U.S. 848 (1990) (finding "beyond any doubt that OCSLA is itself a Congressionally mandated choice of law provision requiring that the substantive law of the adjacent state is to apply even in the presence of a choice of law provision in the contract to the contrary"); *see also Matte*, 784 F.2d at 631 (concluding choice of law provision between parties violated "the federal policy expressed in [OSCLA], which seeks to apply the substantive law of the adjacent states to problems arising on the Shelf").

In *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352 (1969), the Supreme Court addressed whether the Death on the High Seas Act or state law, applicable by virtue of OCSLA's choice of

law provision, controlled two tort claims arising out of fatal accidents on artificial drilling rigs on the Outer Continental Shelf. *Id*. at 352. The Court held that the sole remedy arose under state law and rejected wholesale the application of admiralty law. *Id*. at 355, 360 (explaining that "the accidents had no more connection with the ordinary stuff of admiralty than do accidents on piers"). The distinctive text and legislative history of OCSLA weigh against the application of admiralty law to claims arising out of the accidental death of shelf workers on platforms. *Id*. at 361 ("[T]hese structures were to be treated as island[s] or as federal enclaves within a landlocked State, not as vessels."). And under OCSLA, "for federal law to oust adopted state law federal law must first apply." *Id*. at 359. *Rodrigue* initially recognized "the operative assumption underlying [OCSLA]," that is, "admiralty jurisdiction generally should not be extended to accidents in areas covered by OCSLA." *Offshore Logistics v. Tallentire*, 477 U.S. 207, 218 (1986) (citing *Rodrigue*, 395 U.S. at 361).[9]

---

[9]*Chevron Oil Co. v. Huson*, 404 U.S. 97, 99 (1971), *overruled on other grounds by Harper v. Va. Dep't of Taxation*, 509 U.S. 86 (1993), reiterated the disjoint between OCSLA's application and the application of admiralty law occasioned by OCSLA's choice of law provision: "[OSCLA] does *not* make admiralty law applicable to" personal injury actions on an artificial island drilling rig. *Id*. (emphasis added). In the context of personal injury to workers on the Shelf, this proposition has been widely recognized. *See Gulf Offshore*, 453 U.S. at 481; *Dahlen v. Sec. Ins. Co. of Hartford*, 281 F.3d 487 (5th Cir. 2002) (rejecting argument that the Admiralty Extension Act made admiralty applicable and holding OCSLA required application of the law of the adjacent state, rather than maritime law); *Recar*, 853 F.2d at

While *Rodrigue* speaks to "accidents actually occurring on the [artificial] islands," 395 U.S. at 366, this situs-based element of determining whether platform-related torts are covered by OCSLA has been extended in this Circuit. *Recar*, 853 F.2d at 368-69. We have held that OCSLA's text and history require application of the Act to harm arising directly from the repair and maintenance of fixed platforms on the Shelf, even when the harm occurs as a result of a rope failure related to platform maintenance. *Id*. Thus, in this Circuit, *Rodrigue* is not limited to harm occurring on the fixed platform itself. *See id*. *Rodrigue* could not be so limited, even in the absence of *Recar*, given the plain and broad text of OCSLA, *see* 43 U.S.C. § 1333(b)(1)-(2), and the Act's legislative history, which reveals that Congress intended to treat the unique geography and commerce of the Outer Continental Shelf independently, *see Gulf Offshore*, 453 U.S. at 480 n.7; *Rodrigue*, 395 U.S. at 364-65 (explaining Congress's intent to treat causes arising out of the development of the Outer Continental Shelf differently from

_____

369 (holding OCSLA granted jurisdiction and declining to review whether admiralty might also apply, independent of OCSLA). *But see Demette v. Falcon Drilling Co.*, 280 F.3d 492, 500-01 (applying the Longshore Harbor Workers' Compensation Act to an employee injured on the Outer Continental Shelf and applying maritime law to the relevant indemnity contract). Admiralty law does not govern the merits simply because OCSLA covers the cause of action, and the parties' agreement to the contrary will not alter this rule.

22

traditional maritime claims).[10]

Interpreting *Rodrigue*'s treatment of OCSLA in *Laredo*, we held that maritime law did not extend to cover a dispute arising out of the contract for an oil platform's construction. *Laredo*, 754 F.2d at 1229. "[I]n the context of oil and gas exploration on the Outer Continental Shelf, admiralty jurisdiction and maritime law will only apply if the case has a sufficient maritime nexus wholly apart from the situs of the relevant structure in navigable waters." *Id*. at 1230.

> That the contract contemplated in part the use of instruments of admiralty, therefore, is not sufficient to oust OCSLA-adopted state law in this case. Nor do we think that, under the circumstances existing here, the fact that the contract relates to offshore oil and gas

---

[10]*Rodrigue*'s analysis of OCSLA's legislative history explains that the unique nature of the Shelf and Congress's treatment of it and its resources is inherently incompatible with admiralty law.

> Careful scrutiny of the hearings which were the basis for eliminating from [OSCLA] the treatment of artificial islands as vessels convinces us that the motivation for this change, together with the adoption of state law as surrogate federal law, was the view that maritime law was inapposite to these fixed structures . . . .

*Rodrigue*, 395 U.S. at 363.

Congress might have applied admiralty law to the jurisdiction covered by OCSLA, but calculated that substantive maritime law was ill-suited to serve the needs Congress intended to address. "Moreover, the committee [considering the bill underlying OCSLA] was acutely aware of the inaptness of admiralty law. The bill applied the same law to the seabed and subsoil as well as to the artificial islands, and admiralty law was obviously unsuited to that task." *Id*. at 364-65.

> exploration is itself a sufficient basis for the exercise of admiralty jurisdiction.

*Id.* at 1231-32.

The instant dispute materially parallels *Laredo* because, as we have explained, the relationship of the alleged wrong to traditional maritime activity is insufficient to permit the application of maritime law. And federal maritime law cannot oust the application of state law where maritime law does not apply of its own force. *See id.* at 1229.

Three conditions bear upon the question of whether adjacent state law applies as surrogate federal law under OCSLA. *Union Tex. Petroleum*, 895 F.2d at 1047.

> (1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law.

*Id.* OCSLA requires the application of state law as borrowed federal law to a non-maritime contract dispute arising out of the construction of a gathering line on the seabed of the Outer Continental shelf. *Id.* at 1050.

The first and second *Union Texas Petroleum* conditions are satisfied here. As we have already explained, the complaint arises on an OCSLA situs because the claims are inextricably linked to the construction of a platform permanently fixed to the Shelf for the purposes of development and would not have arisen but for such development. And maritime law cannot apply of its own force

24

because there is an insufficient connection between the underlying torts and traditional maritime activity. *See id*. at 1047-48. The damages allegedly caused by a defectively designed or maintained *portion* of the crane (or by defective wire rope or by the negligent inspection and maintenance of those two specific parts engaged in the compliant tower's construction) are not the stuff of traditional maritime activity on the high seas. *See Rodrigue*, 295 U.S. at 360; *see also Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 422 (1985) (describing *Rodrigue* as "indicat[ing] that drilling platforms [are] not even suggestive of traditional maritime affairs"). There is nothing inherently maritime about the alleged causes of the damages in this case of platform construction, especially as "exploration and development of the Continental Shelf are not themselves maritime commerce." *See Herb's Welding*, 470 U.S. at 425.

These torts arise out of the atypical circumstances of the construction of a fixed, compliant tower on the Outer Continental Shelf, an area unlike any other in its geography and resources that Congress determined require unique treatment by federal law. *See Rodrigue*, 395 U.S. at 361, 363-65. The DB-50's involvement in the accident and other elements of maritime activity that precede or surround the compliant tower's construction on the Shelf are insufficient to support either admiralty jurisdiction or the application of substantive maritime law. Texaco's claims are

25

governed by OCSLA and not by maritime law.

This conclusion is bolstered by the contrast between the allegations of this cause of action with past circumstances under which OCSLA has not been triggered. OCSLA does not cover the wrongful deaths of platform workers "killed miles away from the platform and on the high seas simply because" of their employment status. *Tallentire*, 477 U.S. at 219. Here is not a suit arising from "a function traditionally performed by waterborne vessels," *id.*, but rather a claim arising from traditionally non-maritime products liability and negligence in the maintenance or inspection of specific parts related to construction of a fixed, compliant tower on the Outer Continental Shelf. OCSLA controls to the exclusion of admiralty law.[11]

Accordingly, we also must remand for further proceedings because the district court erred in its application of substantive maritime law to Texaco's claims. An additional difficulty presents

---

[11]*Texaco I* does not preclude our conclusion here that admiralty has no application. *Texaco I* did not address subject matter jurisdiction, nor did it review the substantive law applicable to the action. 243 F.3d at 908-12. References in the opinion to admiralty law were not central to the holding that the Arbitration Act required a stay of the proceedings between Texaco and McDermott to permit the arbitration required by the parties' contractual agreement, but the panel assumed admiralty's application in order to resolve the narrower question put before it. *Id.* at 912. Indeed, the panel did not resolve definitively whether admiralty applied, stating instead that "regardless of whether the Petronius construction contract is treated as a maritime transaction or simply as interstate commerce, the FAA applies." *Id.* at 909 n.2.

on this record: no party identifies the adjacent state such that the law of the adjacent state may be applied. *See Union Tex. Petroleum*, 895 F.2d at 1047. On remand, the first order of business will be the determination of which state's law applies under OCSLA. Subsequently, the district court should address the jury demand in light of the applicable state products liability and negligence law.

**C. Denial of Jury Trial Was Not Harmless Error**

AmClyde argues that even if a jury trial were properly requested, there was no harmful error in the district court's denial of the jury trial demand because Texaco's case failed to survive AmClyde's Rule 50(a) motion for judgment as a matter of law. *See McDonald v. Steward*, 132 F.3d 225, 230 (5th Cir. 1998) (providing settled law that "even if a party is erroneously denied a jury trial, the error is harmless if the evidence could not have withstood a motion for a directed verdict at trial"); *Roscello v. Southwest Airlines Co.*, 726 F.2d 217, 220 (5th Cir. 1984).

We review the district court's judgment as a matter of law *de novo*. *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 409 (5th Cir. 2004). Judgment as a matter of law is appropriate only when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court determines reasonable people could not arrive at a contrary verdict. *Id*.

Texaco argues that substantial evidence on disputed facts

27

supports the possibility of a jury verdict in its favor. In light of our conclusion that OCSLA and, under 43 U.S.C. § 1333, the law of the adjacent state apply, we cannot say that the denial of jury trial in this case was harmless error. In the absence of the application of admiralty law, AmClyde's arguments supporting bench trial disposition of this cause, on the sole basis of maritime law, evaporate. Moreover, the volumes of disputed facts and contradictory expert opinions presented prevent us from concluding that no reasonable jury would find for Texaco. Experts opined on physical evidence and calculations related to the functioning of the crane, and contradictory opinions on those facts requires the conclusion that a reasonable jury might find in favor of Texaco.[12]

For the foregoing reasons, on this record we cannot affirm the district court's judgment as a matter of law in AmClyde's favor. We must remand for further proceedings in light of our holdings that the district court exercises subject matter jurisdiction over the cause based upon OCSLA; that, contrary to the parties' assertions, the nature of Texaco's cause does not permit the application of admiralty law; and that, under OCSLA, the

---

[12]Texaco also argues that the district court abused its discretion in excluding the testimony of two Texaco witnesses, Messrs. Zielinski and Czerniak, as a sanction for Texaco's failure to timely disclose protected proprietary information to parties. Texaco argues that the court's improper sanction exacerbated the harm caused by the denial of jury trial. Finding that the error was not harmless on other grounds, we need not resolve this issue, but we note that whatever reasons precipitated the district court's sanction for discovery delay will not exist on remand.

substantive law applicable to Texaco's claim on remand is the law of the adjacent state, *see* 43 U.S.C. § 1333(a)(2)(A).

## II.  Underwriters' Appeal

Underwriters separately appeal the district court's entry of summary judgment against them on issues related to insurance coverage under the Builder's Risk Policy and defense costs awarded to AmClyde.[13]  The parties fail to identify the applicable law, although Underwriters suggest the dispute is resolved in the same manner whether Texas or Louisiana law applies to the insurance policy.  The district court did not conduct a choice-of-laws analysis and applied the law of Louisiana to the cross motions for summary judgment.  No party objected to that choice of law below, and no party objects to the application of Louisiana law to the insurance policy disputes on appeal.

## A.  AmClyde Is an "Other Assured" Under the Builder's Risk Policy Entitled to Waiver of Subrogation and Defense Costs

Underwriters appeal the district court's October 11, 2001 order that under the Heddington Offshore Construction Risks Policy (the "Builder's Risk Policy"), AmClyde was an "other assured" entitled to a waiver of subrogation and costs under the policy's terms.  Underwriters argue that to be included as an other assured

---

[13]Again, the actions of Texaco and Underwriters were initially separate, but the district court consolidated them on Underwriters' motion for reasons of expediency.  On appeal, Texaco and Underwriters separately briefed their challenges to the district court's rulings, and accordingly, we treat them separately here.

a party must have a written contract with Texaco, the principal assured, and that AmClyde lacks such a written contract. Underwriters further argue that AmClyde cannot be an other assured even if no written agreement is required. Underwriters challenge the district court's determination that AmClyde is entitled as an other assured to the protection of the subrogation clause and the court's award of costs to AmClyde under the policy.

**1. AmClyde Is an Other Assured Under the Policy**

The "other assured" provision of the Builder's Risk Policy states,

> J. Ray McDermott, Inc. and/or Gulf Island Fabrication, Inc. and/or W.H. Linder & Associates, Inc. and/or Waldemar S. Nelson and Company, Inc. and/or Project Consulting Services, Inc. <u>and/or other contractors and/or sub-contractors and/or suppliers and any other company, firm, person or party with whom the Assured(s) in (1), (2) or (3) of this Clause have, or in the past had, entered into written agreement(s)</u> in connection with the subject matters of Insurance, and/or any works, activities, preparations etc. connected therewith.

Builder's Risk Policy, at 2, ¶1. (emphasis added).[14]

The parties dispute the proper reading of the above listing

_____

[14]The principal assureds are defined as

(1) Texaco Exploration and Production, Inc. and/or Marathon Oil Company Inc. and/or associated partners in the Petronius Project and/or as may be agreed hereon.

(2) Parent and/or subsidiary and/or affiliated and/or associated and/or inter-related companies of the above as they now exist or may hereafter be constituted and their Directors, Officers and/or employees and/or other participants as may be agreed.

(3)  Project managers, if applicable.

30

of covered entities and persons; in particular, they dispute whether the "written agreement(s)" requirement applies only to "any other company, firm, person or party" or, instead, applies to all preceding entities. According to Underwriters, the requirement of past or current "written agreement(s)" applies to each preceding entity in the entire list. Underwriters would read the requirement of entry into written agreement to apply to "other contractors and/or sub-contractors and/or suppliers and any other company, firm, person or party." According to AmClyde, the list separates entities with the conjunction "and/or" and therefore, the written agreement provision applies only to "any other company, firm, person or party." Under AmClyde's reading, "other contractors" and "sub-contractors" are each "other assureds," irrespective of any written agreement with Texaco or another principal assured.

We review the district court's legal conclusions, including its interpretation of contracts, *de novo*. *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001); *Nolan v. Golden Rule Ins. Co.*, 171 F.3d 990, 992 (5th Cir. 1999). In interpreting the language of the Builder's Risk Policy on AmClyde's motion for summary judgment, the district court applied Louisiana law, and the parties do not contest the choice of law. Underwriters submit that the Builder's Risk Policy enjoys equal contacts with Texas and Louisiana and urges that the issue presented is resolved identically under either state's law.

31

A contract is unambiguous if "its language as a whole is clear, explicit, and leads to no absurd consequences, and as such it can be given only one reasonable interpretation." *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 n.6 (5th Cir. 2004). The clear construction of the provision provides a list of categories of assureds, separating each category by the conjunction "and/or." The final category is itself a list with an attendant qualification: "suppliers and any other company, firm, person or party" with whom an assured entered an applicable written agreement.[15] Thus, the requirement of written agreement does not apply to the separate categories that precede this final sub-list, including a subcontractor. Under the unambiguous language of the Builder's Risk Policy, a contractor or subcontractor may be an other assured, irrespective of the written agreement qualification.

Underwriters point to *OPI International, Inc. v. Gan Minster Insurance Co.*, an unpublished opinion from the Southern District of Texas, in support of their argument that AmClyde is not an other assured. *See* Nos. H-94-2756, H-94-3412, H-94-3413, 1996 WL 650130 (S.D. Tex. Mar. 12, 1996). But *OPI International* does not inform the analysis in this matter because the policy language at issue there was materially different from the other assured definition at

---

[15]That it might be debated whether the written agreement qualification applies only to "other company firm, person or party" or to those entities as well as "suppliers" need not be resolved here because AmClyde is a subcontractor.

32

issue here. *See id*. at *3. In *OPI International*, the definition of other assureds included "contractors and/or subcontractors" within the group of "other Compan[ies]" with whom the assureds had entered into contracts. *See id*. Such is not the case here, where the other assured definition separates subcontractors, contractors, and suppliers from the group of other companies with whom the assureds have entered into written contracts.

Moreover, Underwriters' proposed reading of the policy provision would result in the absurdity that a covered subcontractor would be required to have entered into a written contract with Texaco or a principal assured, thereby becoming a contractor. By definition, a subcontractor enters into an agreement with a contractor, rather than the principal party whose performance is payment in exchange for the provision of goods or services or the completion of a project. *See*, *e.g.*, BLACK'S LAW DICTIONARY 1464 (8th ed. 2004). Had AmClyde contracted with Texaco or a principal assured, a party to the contract who sought the Petronius construction project's completion, AmClyde would be a contractor as opposed to a subcontractor. Underwriters' reading of the "other assured" provision would render the term "subcontractor" surplusage, and such a reading must be avoided under Louisiana law and under principles of contract interpretation both generally and in the maritime context. *See* LA. CIV. CODE ANN. art. 2049; *Chembulk Trading*, 393 F.3d at 555; *Transitional Learning Cmty. at Galveston,*

33

*Inc. v. U.S. Office of Personnel Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000). The district court correctly concluded that the unambiguous policy language does not require a written agreement with respect to a subcontractor in order for the subcontractor to qualify as an other assured. Having determined that the policy language is unambiguous, we need not reach beyond the four corners of the document to explore the intent of the parties. *See*, *e.g.*, *Ingalls Shipbuilding v. Fed. Ins. Co.*, 410 F.3d 214, 220 (5th Cir. 2005).

Underwriters next argue that even in light of the reading we determine the policy requires, AmClyde is not a subcontractor and therefore cannot qualify as an other assured. "A subcontractor is one who takes a portion of a contract from the principal contractor or another subcontractor." *Avondale Indus., Inc. v. Int'l Marine Carriers, Inc.*, 15 F.3d 489, 494 (5th Cir. 1994). "A subcontractor may or may not have an agency relationship with the contractor and that relationship does not control whether or not a subcontract has been struck." *Id*.

The record reflects that AmClyde is a subcontractor to Texaco's Petronius tower construction project. AmClyde and McDermott entered a written agreement requiring AmClyde's provision of work to McDermott and covering the work provided by AmClyde to the Petronius tower construction project. The record also reveals that subject to its contract with McDermott, AmClyde provided the following services to the Petronius construction project: design of

34

the deep water lowering system for use on the underwater installation of the tower support structure for the Petronius project, technical advice to McDermott related to the crane's extended travel service and underwater use during the Petronius project, and technical advice on the main hook loading for the lifts of the North and South Deck Modules, specifically.

In light of the contractual agreement between AmClyde and McDermott, in combination with AmClyde's provision of work to the Petronius project itself subject to that contract, including the the very lift of the deck module most closely tied to the property loss at the heart of this case, AmClyde is a subcontractor to the Petronius tower construction project. And although the degree of AmClyde's role in the overall construction of the compliant tower may not be substantial when compared to others' roles in construction, AmClyde's efforts in designing the lowering system used to install the support structure of the compliant tower and in calculating the hook eccentricity, a requisite part of the lifts, were integral to and required for compliant tower construction. Also, the allegations in Underwriters' own complaint support in part that Underwriters understood AmClyde's status as a subcontractor. Underwriters alleged that AmClyde's technical contribution to and efforts in the design and maintenance of the crane were specifically "in connection with" the Petronius project. Underwriters alleged AmClyde's negligence in "maintaining and/or inspecting the crane in connection with . . . the Texaco Petronius

Project, specifically, including the South Deck Module."

After careful review of the record, the briefs of the parties, and the oral arguments, we affirm the district court's conclusion that AmClyde is an "other assured" under the Policy on the basis that AmClyde was a subcontractor. The record reflects AmClyde's subcontractor status in form of a written agreement to provide work to McDermott and AmClyde's actual provision of work, under contract with McDermott, related to the Petronius tower construction project. As subcontractor, under the Policy's unambiguous language, AmClyde is an other assured. The policy provides for waiver of subrogation against any assured and any entity or person "whose interests are covered by this Policy." Thus, AmClyde is entitled to the waiver of subrogation.

## 2. The District Court Properly Awarded Costs to AmClyde

Underwriters argue that the district court erred in awarding costs to AmClyde for its defense. In pertinent part, the Builder's Risk Policy provides,

> With respect to costs, the Builder's Risk Policy provides Subject only to the limits and deductibles of this Policy, the Company agrees to pay costs, charges and expenses reasonably incurred in investigating and/or defending any claim or incident which in the Assured's opinion may result in a claim being pursued against them in connection with this project. This policy will also reimburse the Assured for expenditures necessarily incurred in obtaining legal representation and/or non-legal expert witness(es) in the event of a public or government enquiry into any accident or occurrence, provided such accident or occurrence would give rise to a claim under this policy.

36

Builder's Risk Policy, at 6, ¶ 11.

Underwriters argue that the above clause does not apply because the claims related to delay defended by AmClyde are excluded from coverage under both the property damage section, section one, and the general liability sections of the policy. Underwriters also argue that the policy bars coverage for claims between insureds for damage to the insured property. Underwriters finally objects to the district court's costs award, arguing that costs were awarded twice to AmClyde. AmClyde argues that the plain meaning of the clause supports the award of defense costs and that the amount of the award was proper.

According to Underwriters, the division of the policy into two relevant sections – section one regarding physical damage and section two regarding general liability – requires that the costs award was in error because AmClyde, not an "other insured" under section two of the policy but an "other assured" under the physical damage section, cannot recover third party liability defense costs. Underwriters argue that any other result confuses the nature of third party liability and first party property coverage.

Section two of the policy contains a cross-liability clause that permits coverage of claims or potential claims between assureds. The clause explains that such cross-liability coverage will not operate to increase the limit of liability and that section two does not provide coverage for physical loss of or damage to the insured property. Underwriters reads the cross-

37

liability provision broadly and in combination with the costs provision to indicate that costs cannot be recovered in relation to the delay claim between assureds here. In support of this argument, Underwriters relies on *Agip Petroleum Co. v. Gulf Island Fabrication, Inc.*, No. 00-20487 (5th Cir. Nov. 28, 2001). In *Agip Petroleum*, a panel of this Court addressed an appeal of summary judgment for Underwriters regarding general liability coverage and concluded that under Texas law, a builder's risk policy with a general liability provision similar to section two here did not provide coverage for liability claims between assureds for damages to the insured property. *Id*. at 7, 17. In *Agip Petroleum*, Underwriters did not appeal the summary judgment awarded to the contractors in regard to the subrogation claim, and the Court did not address the issue of costs. *See id*. at 7. According to Underwriters, the Costs Clause at issue here operates only when a covered claim arises and no such claim exists here because Texaco chose not to insure damages due to delay. Underwriters cites *Agip Petroleum* for the proposition that the delay damages are not covered, thereby precluding the award of costs in the defense of one insured against another for uninsured damages. AmClyde argues that the plain meaning of the clause supports the conclusion that its defense costs against Texaco must be paid by Underwriters and therefore the district court properly awarded costs.

We agree with AmClyde that a plain reading of the Costs Clause

38

indicates Underwriters must pay costs incurred by an insured to defend a claim "in connection with" the Petronius construction project. In relevant portion, the policy states, "the Company agrees to pay costs . . . reasonably incurred in . . . defending any claim or incident which in the Assured's opinion may result in a claim being pursued against them in connection with this project." Moreover, the policy provides for defense costs in relation to "a public or government enquiry into any accident or occurrence [that] would give rise to a claim under this policy." The clause fails to limit costs to the defense of certain claims, and contrary to Underwriters' characterization, the plain language of the Costs Clause provides a broad duty to pay defense costs connected to the compliant tower's construction even when the clause is read in conjunction with other policy provisions. The broad language of the Costs Clause permits a costs award even in relation to a claim that may not ultimately be covered under the policy language. We affirm the district court's award of costs to AmClyde under the Builder's Risk Policy.

With respect to Underwriters' argument that costs were erroneously awarded twice, we similarly affirm the district court's award. Pretrial, AmClyde and Underwriters stipulated to the reasonableness of eighty percent of the defense costs. Underwriters challenged the remainder on the ground that costs for all multiple entities, including two not insured under the policy, were included in the calculation and requested allocation among the

defendants. The district court granted costs in the stipulated amount of $2,534,000 but did not require allocation, finding that the two entities not insured were predecessors in interest to AmClyde that were represented by AmClyde's counsel and that the entities appeared, in all respects, in the same posture as AmClyde, facing the same liability and requiring precisely the same defense as did AmClyde.

Underwriters argue the burden of allocating defense costs falls to AmClyde. Underwriters rely upon *Enserch Corp. v. Shand Morahan & Co.*, 952 F.2d 1485, 1493 (5th Cir. 1992). AmClyde argues that no allocation is necessary because the four entities related to AmClyde were all sued in the same capacity and that no basis exists for deducting costs associated with any entity's defense because its liability was wholly derivative of AmClyde's. AmClyde points to the repeated reference to the four entities defending the faulty design, manufacture, and inspection of the crane as either "AmClyde" or the "AmClyde Defendants." AmClyde cites in support a district court opinion from California where the court did not require allocation in the case of a non-insured party's liability deriving entirely from the insured party and a covered claim. *See Raychem Corp. v. Fed. Ins. Co.*, 853 F. Supp. 1170, 1180 (N.D. Cal. 1994). In arguing that an allocation is unnecessary, AmClyde points to no controlling law on point.

The record makes clear that the nature of the AmClyde related

entities was well understood to all parties and to the district court below. AmClyde's incurred defense costs properly result from the uniform defense of multiple factual entities appearing before the court as one legal entity based upon Texaco and Underwriters' complaints and the nature of the claims. This Circuit has not required an allocation on such a record, and Underwriters fail to point to any controlling law so requiring. Finding no error in the court's award, we affirm the award of defense costs to AmClyde.

**B.  JRMIV Is an Other Assured Entitled to Waiver of Subrogation**

Based upon the foregoing, we similarly affirm the district court's conclusion that JRMIV was an other assured entitled to waiver of subrogation. JRMIV argued before the district court that Underwriters could not proceed in subrogation against it because of express waivers of subrogation in the Builder's Risk Policy and because JRMIV is an other assured against whom subrogation is waived. On March 31, 2003, the district court granted JRMIV's motion for dismissal of Underwriters' subrogation action. The court held that Underwriters expressly waived rights of subrogation against it as an insured in the Builder's Risk Policy because JRMIV qualified as an insured subcontractor. The court also concluded that JRMIV is an affiliate or contractor/subcontractor under the waiver of subrogation provision for affiliate entities and is also therefore entitled to waiver of subrogation. Alternatively, the district court concluded that JRMIV did not bear liability for any

41

unseaworthiness of the DB-50 because McDermott was the bareboat charterer of the DB-50 and was, as such, solely responsible for the vessel's operation. The district court accordingly dismissed Underwriters' claims against JRMIV.

Because we conclude that the unambiguous policy language does not require a written agreement in order for a contractor or subcontractor to qualify as an other assured entitled to waiver of subrogation, we need here only address whether JRMIV was a subcontractor or contractor to the compliant tower's construction to resolve its status as an other assured. JRMIV argues that its contribution to the Petronius construction project qualifies it as either or both. Underwriters disagrees, echoing its arguments with respect to AmClyde, that is, that the definition of "other assureds" requires a written contract of all entities and that therefore JRMIV does not qualify as an other assured.

The policy expressly includes as an other assured, entitled to waiver of subrogation, a contractor with Texaco relating to the Petronius construction project. As previously explained, McDermott entered a written construction agreement with Texaco covering the Petronius tower construction project. There, the parties defined as a "Contractor" both (1) McDermott and (2) McDermott's "parent, subsidiaries, and affiliates, the agents, employees and subcontractors of any of them." McDermott and JRMIV are affiliates; both are wholly owned subsidiaries of McDermott Holdings. Accordingly, Texaco and McDermott defined JRMIV as a

42

Contractor to the Petronius construction project in the written construction agreement. Moreover, JRMIV, the owner of the DB-50 and attached crane, provided the vessel that was a subject of the construction contract. JRMIV's provision of the vessel satisfied the construction contract's guarantee provided by Contractor (that is, McDermott and JRMIV as an affiliate of McDermott) for the provision of the DB-50 to perform the installation activities described in the construction contract. JRMIV was a contractor to the Petronius project under the terms of the construction contract and, accordingly, under the terms of the Builder's Risk Policy. As the written agreements of the parties require us to so conclude, we need not also address the other arguments advanced by JRMIV to trigger its status as an other assured.

The district court correctly dismissed Underwriters' subrogation claim against JRMIV, and although multiple arguments may have supported such action, we need not address any other argument offered in support of the dismissal of Underwriters' claim.

## CONCLUSION

With respect to Texaco's appeal, we hold that OCSLA extends federal subject matter jurisdiction to the tort action that arose on the unique construction site of the Petronius compliant tower; that admiralty jurisdiction and maritime law do not apply so as to oust the substantive law of the adjacent State; and that in light

43

thereof, the denial of jury trial cannot be said to be harmless.

On remand, the district court should permit Texaco an opportunity to amend its pleading and should request that the parties address at the outset which state's law is adjacent to the Petronius compliant tower and determine accordingly the applicable tort law under OCSLA. Texaco has preserved its request for a jury trial as well as its request for the inclusion of its experts' testimony. The district court should reassess the jury trial demand and the admissibility of the experts' testimony in light of the state's law that is borrowed as federal law under OCSLA.

We affirm the district court's dismissal of Underwriters' suit seeking subrogation against AmClyde and JRMIV. Each entity is an other assured entitled to waiver of subrogation, and the court did not err in its award of defense costs to AmClyde.

Accordingly, we affirm in part and reverse in part the district court's judgment and remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED IN PART; and REMANDED.**