REVISED MARCH 20, 2013

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

February 1, 2013

Lyle W. Cayce
Clerk

No. 12-20150

FRANCIS BARKER, JR.,

> Plaintiff - Appellant

v.

HERCULES OFFSHORE, INC; HALL-HOUSTON EXPLORATION II, L.P.;
HALL-HOUSTON EXPLORATION PARTNERS, L.L.C.; HALL-HOUSTON
EXPLORATION COMPANY,

> Defendants - Appellees

Appeals from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, CLEMENT, and HAYNES, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:[*]

After watching his friend and co-worker die as a result of an accident on a jack-up rig attached to the Outer Continental Shelf ("OCS"), Francis Barker filed suit in Texas state court seeking relief under general maritime law, the Longshore and Harbor Workers' Compensation Act ("LHWCA"), and Texas tort law. The District Court for the Southern District of Texas denied Barker's

---

[*] Judge Haynes concurs in this opinion except for section I.b., which she does not join.

motion for remand and granted summary judgment to Defendants Hall-Houston and Hercules Offshore under Texas law or, in the alternative, under general maritime law. On appeal Barker challenges both the denial of the remand motion and the grant of summary judgment. For the following reasons, we AFFIRM.

## FACTS AND PROCEEDINGS

Hall-Houston Exploration II is the owner of a federal mineral lease located on the Outer Continental Shelf off the coast of Texas and outside of Texas state waters. In January 2008, Hall-Houston contracted with Hercules Offshore to obtain a mobile offshore jack-up drilling unit or drilling rig, known as the Hercules 251, to drill offshore oil and gas wells including the well at issue in this case. Hall-Houston also contracted with Frank's Casing to run a 60 inch casing over the well before drilling commenced.

On January 27, 2008, Barker, a welder employed by Frank's, was performing work onboard the Hercules 251 rig in preparation for running the casing over the well. At the time of the incident the drilling rig was in the "jacked-up" position, meaning that its hull and work deck were lifted completely out of the water. The legs of the rig extended downward through the water into the seabed which provided the means of support. In order to drive the casing over the well, Frank's employees had to enlarge a hole in the pollution pan, which sat about six feet below the rig's floor. Unbeknownst to the Frank's crew, the pollution pan was not welded to the rig structure as is customary in the standard jack-up configuration, but instead was held in place by straps that were in turn welded to the structure. Barker and his long-time friend Frank Broussard were told to, and did, cut the straps supporting the pan, causing the pan to fall 100 feet into the ocean. Frank Broussard was standing on the pollution pan when it fell, and although he was initially able to hang on to a beam for support, he lost his grip and fell into the ocean, striking another beam

on the way down. When the incident occurred Barker was standing about two feet from the pan with his back turned. Although he did not see the incident itself, he turned around in time to witness his friend fall to his death.

Barker filed suit against Hercules and Hall-Houston ("Defendants") in Texas state court. Although Barker admits he was not physically injured in the incident, he claims to have suffered severe emotional distress from witnessing his friend's death. He also alleges various physical injuries resulting from that emotional injury.

Barker alleged three causes of action in his original petition. He sought general, special, and punitive damages for negligence, gross negligence, and wanton disregard for his safety and that of Broussard under general maritime law or, in the alternative, under 33 U.S.C. § 905(b) of the Longshore and Harbor Workers' Compensation Act. He also sought general, special, and punitive damages under Texas tort law to the extent that Texas tort law supplemented or supplanted general maritime law.

Defendants removed this action to the Southern District of Texas under the jurisdictional grant contained in the Outer Continental Shelf Lands Act ("OCSLA"). The district court denied Barker's motion to remand and granted summary judgment to Defendants, holding that Barker could not recover under either Texas law or maritime law. On appeal, Barker challenges the district court's decisions with respect to both his motion to remand and the Defendants' motion for summary judgment.

## STANDARD OF REVIEW

This court reviews decisions denying remand de novo. Maguno v. Prudential Prop. & Cas. Ins. Co., 276 F.3d 720, 722 (5th Cir. 2002). On a motion to remand, "[t]he removing party bears the burden of showing that federal jurisdiction exists and that removal was proper." Id. at 723. "Any ambiguities

are construed against removal because the removal statute should be strictly construed in favor of remand." Id.

"This court reviews a district court's grant of summary judgment de novo, applying the same standards as the district court." Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston, 660 F.3d 235, 238 (5th Cir. 2011). "Summary judgment is warranted if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine [dispute] as to any material fact and that the movant is entitled to judgment as a matter of law." Id. (alteration in original).

## DISCUSSION

### I. Motion to Remand

The district court held, and Defendants maintain on appeal, that Barker's suit was properly removed to federal court because the Outer Continental Shelf Lands Act provides federal subject matter jurisdiction over this action pursuant to 43 U.S.C. § 1349(b)(1). Barker concedes that OCSLA provides original federal subject matter jurisdiction as required for removal under 28 U.S.C. § 1441(a), but nevertheless argues that removal was improper because maritime law provides the rule of decision, and therefore this action can only be removed if no defendant is a resident of the state where the suit is brought. See 28 U.S.C. § 1441(b) (2011).[2] For the following reasons, we hold that removal of this action was proper.

### a. Background and application of OCSLA

When it was passed in 1953, the purpose of OCSLA was to allocate to the federal government "jurisdiction, control, and power of disposition" over "the subsoil and seabed of the Outer Continental Shelf."[3] 43 U.S.C. § 1332(1).

---

[2] This is the version of the statute that was in effect when this suit was removed.

[3] The Outer Continental Shelf consists of the seabed and natural resources underlying the coastal waters greater than three geographical miles from the coastline. See

OCSLA asserts exclusive federal question jurisdiction over the OCS by specifically extending "[t]he Constitution and laws and civil and political jurisdiction of the United States . . . [to the OCS] and all installations and other devices permanently or temporarily attached to the seabed . . . for the purpose of exploring for, developing, or producing resources therefrom." Id. § 1333(a)(1); accord id. § 1349(b)(1); see also Recar v. CNG Producing Co., 853 F.2d 367, 370 (5th Cir. 1988) (acknowledging that "OCSLA invests [a] district court with original federal question jurisdiction."). The jurisdictional grant in OCSLA is broad, covering a "wide range of activity occurring beyond the territorial waters of the states." Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co., 448 F.3d 760, 768 (5th Cir. 2006) amended on reh'g, 453 F.3d 652 (5th Cir. 2006) (quoting Demette v. Falcon Drilling Co., 280 F.3d 492, 495 (5th Cir. 2002), overruled on other grounds by Grand Isle Shipyard v. Seacor Marine, LLC, 589 F.3d 778 (5th Cir. 2009) (en banc)).

A plaintiff does not need to expressly invoke OCSLA in order for it to apply. Amoco Prod. Co. v. Sea Robin Pipeline Co., 844 F.2d 1202, 1205 (5th Cir. 1988) ("In determining federal court jurisdiction, we need not traverse the Serbonian Bog of the well pleaded complaint rule because § 23 of OCSLA expressly invests jurisdiction in the United States District Courts." (citation omitted)). To determine whether a cause of action arises under OCSLA, the Fifth Circuit applies a but-for test, asking whether: (1) the facts underlying the complaint occurred on the proper situs; (2) the plaintiff's employment furthered mineral development on the OCS; and (3) the plaintiff's injury would not have occurred but for his employment. See Demette, 280 F.3d at 496; Recar, 853 F.2d at 369. There is no dispute that these requirements are satisfied on the present record.

---

43 U.S.C. §§ 1301(a), 1331(a).

OCSLA covers, among other situs, a device "permanently or temporarily attached to the seabed [of the OCS] . . . for the purpose of exploring for, developing, or producing resources therefrom." 43 U.S.C. § 1333(a)(1)). A jack-up rig attached to the Outer Continental Shelf (like the one at issue in this case) qualifies as such a device. Demette, 280 F.3d at 498. Accordingly, the jack-up rig is a proper OCSLA situs for the purpose of this tort action. See Grand Isle, 589 F.3d at 784-85.

By his own admission Barker's employment on the jack-up rig was directly related to the development of minerals or other natural resources on the OCS. See Tenn. Gas Pipeline v. Houston Cas. Ins. Co., 87 F.3d 150, 154-55 (5th Cir. 1996). Furthermore, it is clear that but for his employment, Barker would not have been involved in the incident forming the basis of this suit. See id. at 155. Therefore, as the parties both acknowledge, this action arises under OCSLA.

b.     Choice of law under OCSLA

The more difficult question in this appeal is whether federal, state, or maritime law provides the substantive rule of decision for Barker's OCSLA claim. For the reasons explained below, the panel chooses not to decide this issue because the result is the same regardless of which law is applied.

Although my colleagues do not join this section of the opinion discussing choice of law under OCSLA, I write separately to offer my thoughts on an area that has given rise to varying conclusions over the last few years. OCSLA provides a federal cause of action for incidents arising on the OCS, and also extends federal substantive law to cover these incidents. 43 U.S.C. § 1333(a)(1); Hufnagel v. Omega Serv. Indus., Inc., 182 F.3d 340, 349 (5th Cir. 1999). The Act borrows from state law to fill any gaps in federal law "[t]o the extent that [state law is] applicable and not inconsistent with this subchapter or with other Federal laws and regulations." 43 U.S.C. § 1333(a)(2)(A). However, when maritime law applies of its own force (meaning that a court could otherwise have

admiralty jurisdiction over the claim), it displaces not only state law, but any federal law that might have applied to the action. Union Tex. Petroleum Corp. v. PLT Eng'g, Inc., 895 F.2d 1043, 1047 (5th Cir. 1990).

As courts in this circuit have acknowledged, the application of maritime law under OCSLA was not explicitly contemplated by its framers. Rather, the application of maritime law under OCSLA is the result of both our long-standing maritime precedent, as well as gaps within the OCSLA statute itself. As one court has noted:

> The legislative history of [OCSLA] clearly shows that Congress intended to preempt the application of maritime law to activities on platforms on the OCS. Unfortunately . . . the statute itself does not say this. . . . Therefore, in this Circuit, federal law as defined by OCSLA does not apply if maritime law applies "of its own force."

Walsh v. Seagull Energy Corp., 836 F. Supp. 411, 415-16 (S.D. Tex. 1993) (citing Rodrigue v. Aetna Cas. & Sur. Co., 395 U.S. 352, 363-66 (1969) and Smith v. Penrod Drilling Corp., 960 F.2d 456, 459 (5th Cir. 1992), overruled on other grounds by Grand Isle, 589 F.3d 778)). This circuit has explicitly recognized the tension between congressional intent and the application of maritime law under OCSLA:

> [W]e note that our caselaw arguably conflicts with OCSLA. As explained in Rodrigue, Congress intended that, after the passage of OCSLA, the oil and gas exploration industries would be governed by state law. Several of our cases recognize Congress's intention to limit the application of maritime law in oil and gas industry cases. See Matte [v. Zapata Offshore Co.], 784 F.2d [628,] 630 [(5th Cir. 1986)]; Thurmond v. Delta Well Surveyors, 836 F.2d 952, 954-55 (5th Cir. 1988); Union Texas Petroleum, 895 F.2d at 1048-49. The Supreme Court has criticized our "expansive" view of maritime employment in Herb's Welding v. Gray, 470 U.S. 414, 422-23 (1985). Only our en banc court, however, can consider whether our expansive view of maritime contracts similarly should be narrowed.

7

Smith, 960 F.2d at 460 (emphasis in original). Although the application of maritime law under OCSLA may be contrary to the intention of Congress, we are bound by our precedent to apply maritime law as the substantive rule of decision where it otherwise applies "of its own force." Union Tex. Petroleum, 895 F.2d at 1047. It is to this question that I now turn.

In order for maritime law to apply to an OCSLA tort action such as this one, there must be both a "maritime situs and a connection to traditional maritime activity." Hufnagel, 182 F.3d at 351. The Supreme Court has repeatedly emphasized the importance of this two-factor test in tort actions, as distinguished from a mere "locality rule." In Executive Jet Aviation, Inc. v. City of Cleveland, Ohio, the Supreme Court recognized that:

> [T]here has existed over the years a judicial, legislative, and scholarly recognition that, in determining whether there is admiralty jurisdiction over a particular tort or class of torts, reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than is a purely mechanical application of the locality test.

409 U.S. 249, 261 (1972). This holding was extended to all maritime torts by Foremost Insurance Co. v. Richardson, after the Supreme Court took note of "the theoretical and practical problems inherent in . . . applying the traditional locality rule." 457 U.S. 668, 673-74 (1982). In Sisson v. Ruby, the Court emphasized that the two-part test should be applied broadly, looking to "the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." 497 U.S. 358, 363 (1990). And in Jerome B. Grubart, Inc., v. Great Lakes Dredge & Dock Co., the Supreme Court officially adopted the two-prong test we use today, noting that, "[a]fter Sisson . . . a party seeking to invoke federal admiralty jurisdiction . . . over a tort

claim must satisfy conditions both of location and of connection with maritime activity." 513 U.S. 527, 534 (1995).

To satisfy the first prong of this test, a plaintiff must show that the tort at issue either "occurred on navigable water," or if the injury is suffered on land, that it was "caused by a vessel on navigable water." Id. In this circuit, jack-up drilling platforms (like the one at issue in this suit) are considered vessels under maritime law. Demette, 280 F.3d 498 n.18 (collecting cases); Smith, 960 F.2d at 460; but see Rodrigue, 395 U.S. at 360 (holding that fixed drilling platforms "were islands, albeit artificial ones. . . . [and that] drilling platforms are not within admiralty jurisdiction."). Even though the first prong of this test is satisfied, however, maritime law will not apply unless this suit also involves a "connection to traditional maritime activity." Hufnagel, 182 F.3d at 351; accord Exec. Jet, 409 U.S. at 261 (emphasizing the importance of this second factor).

To satisfy the second prong of the maritime requirement, a plaintiff must show that the incident caused a "potentially disruptive impact on maritime commerce," and that "the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." Great Lakes, 513 U.S. at 534 (citations and internal quotation marks omitted). Barker makes no serious allegation that any part of the incident, or any of Defendants' failures, affected the jack-up rig's movement across water or affected the movement of any other ships. This tort arose in the ordinary course of offshore drilling, when the vessel was attached to the seabed and not scheduled for travel. In the absence of an explanation as to why a single worker injury upon a jacked-down vessel has a potentially disruptive impact on maritime commerce, I would not find the first part of the connection inquiry satisfied.

The second part of the connection test looks to whether the "tortfeasor's activity . . . on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules

would apply in the suit at hand." Great Lakes, 513 U.S. at 539-40. In applying this test, courts look generally to the activity giving rise to the instant suit. Sisson, 497 U.S. at 365 ("[W]e need not ascertain the precise cause of the [incident] to determine what 'activity' Sisson was engaged in; rather, the relevant activity was the storage and maintenance of a vessel at a marina on navigable waters."). The activity giving rise to this suit was installing casing in furtherance of oil and gas drilling on the Outer Continental Shelf. So classified, I would hold that the general character of this suit does not bear a substantial relationship to traditional maritime activity.[4]

The Supreme Court has stated in no uncertain terms that "exploration and development of the Continental Shelf are not themselves maritime commerce," Herb's Welding, 470 U.S. at 425, and activities upon "drilling platforms [are] not even suggestive of traditional maritime affairs." Id. at 422. Although this circuit had previously adopted a different view, the Supreme Court in Herb's Welding rejected the Fifth Circuit's view that "offshore drilling is maritime commerce," finding that position to be "untenable," in light of the LHWCA and other congressional dictates. Id. at 421; see id at 421-24 (expressly rejecting the "Fifth Circuit's expansive view of maritime employment.").

Furthermore, even if traditional maritime principles would lead to a conclusion that events which occur on jack-up rigs are maritime in nature, we are bound to look to the intention of Congress when interpreting which law applies under OCSLA. See Rodrigue, 395 U.S. at 361 ("Even if the admiralty law would have applied to the deaths occurring in these cases under traditional

---

[4] Although this circuit has varied in the level of generality used in classifying tort actions, see, e.g., Strong v. B.P. Exploration & Prod., Inc., 440 F.3d 665, 669-70 (5th Cir. 2006), the Supreme Court has cautioned against looking narrowly at the specific cause of the harm in applying this test, as that would require courts to "decide . . . the merits of the causation issue to answer the legally and analytically antecedent jurisdictional question." Sisson, 497 U.S. at 365.

principles, the legislative history shows that Congress did not intend that result."). This circuit has already acknowledged the tension between congressional intent and the application of maritime law under OCSLA. However, as noted by Judge DeMoss in his dissenting opinion in Demette, we must be particularly mindful of Congress's 1978 amendment to OCSLA, which expanded the reach of OCSLA from "fixed structures" to "all installations and other devices permanently or temporarily attached to the seabed." 43 U.S.C. § 1333(a)(1) (emphasis added). This amendment "made clear that Federal law [as opposed to maritime law] is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production" of resources, Demette, 280 F.3d at 507 (DeMoss, J., dissenting) (emphasis added) (quoting H.R. Rep. No. 95-590 (1978)), including devices such as jack-up drilling rigs.

I certainly do not disagree that, under our current precedent, incidents which occur on jack-up rigs may bear a substantial relationship to traditional maritime activity when they arise out of or implicate the rig's movement across water. Thus, for example, incidents on jack-up rigs docked at marinas may be classified as maritime in nature, even when those rigs are engaged for the purpose of offshore drilling. Coats v. Penrod Drilling Corp., 61 F.3d 1113, 1119 (5th Cir. 1995) (en banc) (holding that worker injuries in the course of repair and maintenance "can have a disruptive impact on maritime commerce by stalling or delaying the primary activity of the vessel."); see also Sisson, 497 U.S. at 362, 367 (noting that "docking a vessel at a marina on a navigable waterway is a common, if not indispensable, maritime activity," and that a fire upon such a vessel could "spread to nearby commercial vessels or make the marina inaccessible to such vessels." (citation omitted)). This circuit also recognizes that maritime law applies to incidents arising from "repair or maintenance work

11

[performed from a vessel] on a navigable waterway," Great Lakes, 513 U.S. at 540, including work upon jack-up drilling rigs.

However, our case law reflects that incidents which occur as a result of offshore drilling are, for the reasons stated above, generally not maritime in nature. See Texaco Exploration & Prod., Inc. v. AmClyde Engineered Products Co., Inc., 448 F.3d 760, 771 amended on reh'g on different grounds, 453 F.3d 652 (5th Cir. 2006) ("Texaco's complaint . . . arises not from traditionally maritime activities but from the development of the resources of the Outer Continental Shelf . . . [t]o the extent that maritime activities surround the construction work underlying the complaint, any connection to maritime law is eclipsed by the construction's connection to the development of the Outer Continental Shelf"); Hufnagel, 182 F.3d at 352 ("Construction work on fixed offshore platforms bears no significant relation to traditional maritime activity"); Thibodeaux v. Grasso Prod. Mgmt. Inc., 370 F.3d 486, 493 (5th Cir. 2004) ("Both this court and the Supreme Court have expressed the opinion that work commonly performed on oil production platforms is not maritime in nature"); accord Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co., 644 F.2d 1132, 1136-38 (5th Cir. 1981); In re Dearborn Marine Serv., Inc., 499 F.2d 263, 272-73 (5th Cir. 1974); Dozier v. Rowan Drilling Co., 397 F. Supp. 2d 837, 850 (S.D. Tex. 2005).[5]

---

[5]     Despite Barker's allegations to the contrary, contract cases with similar fact patterns are not binding on whether this tort action is maritime in nature, since tort and contract cases apply different tests to determine whether maritime law applies. Dozier, 397 F. Supp. 2d at 849 (citing Hufnagel, 182 F.3d at 351 and Great Lakes, 513 U.S. at 534); accord Grand Isle, 589 F.3d 778. We also note that some such cases are of limited precedential value after the Supreme Court's decision in Herb's Welding, supra. As this court noted in Smith v. Penrod Drilling:

> After Herb's Welding, our cases that propound the maritime nature of offshore drilling-related contracts have been limited to their facts. See Union Texas Petroleum, 895 F.2d at 1049; Lewis [v. Glendel Drilling Co.], 898 F.2d [1083,] 1086 [(5th Cir. 1990)]. In each new case, a panel of this court must comb through a bewildering array of cases that rely upon inconsistent reasoning in the hope of finding an identical fact situation. Absent en banc reconciliation,

Navigating this precedent I would conclude that, when determining whether maritime law applies under the second part of the connection inquiry, this court should look to whether the act which gave rise to the incident in question—in this case, replacing casing over a well—was in furtherance of the non-maritime activity of offshore oil exploration and drilling, or whether it was related to repair and maintenance of a jack-up drilling rig for the purpose of enabling the rig to move across water. I recognize that courts in this circuit have not always followed this test with respect to incidents occurring on jack-up drilling rigs. However, I consider this test to be a faithful application of both Supreme Court precedent—which is structured to divorce the location of the activity from the nature of the activity itself—as well as our own case law. See Laredo Offshore Constructors, Inc. v. Hunt Oil Co., 754 F.2d 1223, 1230 (5th Cir. 1985) ("[I]n the context of oil and gas exploration on the Outer Continental Shelf, admiralty jurisdiction and maritime law will only apply if the case has a sufficient maritime nexus wholly apart from the situs of the relevant structure in navigable waters."); accord Union Tex. Petroleum, 895 F.2d at 1048 ("[T]he principal obligation of PLT and the subcontractors was to build the gathering line and connect it to the platform and the transmission line. These activities are not traditionally maritime. Rather they are the subjects of oil and gas exploration and production."); Dozier, 397 F. Supp. 2d at 850.

---

cases thus are decided on what seems to be a random factual basis. See Lewis, 898 F.2d at 1084 ("[B]ecause of an apparently contradictory line of cases in our circuit and the uncertain policy underpinning our result, the appellant would justly ask 'why?'".)

960 F.2d at 461. We need not delve into the weeds of our contract-based case law here. Although some of this confusion was clarified by our en banc court in Grand Isle, 589 F.3d 778, it is worth noting that the difficulty in reconciling our precedent with the Supreme Court's dictate regarding the non-maritime nature of oil and gas drilling is not limited to maritime torts.

Barker and Broussard's work on the jack-up rig likely falls into the first category. Installing casing is part and parcel of the larger activity of exploring, developing, and producing resources from the Outer Continental Shelf, and not, as Barker maintains, of a "general character [that has a] substantial relationship to traditional maritime activity." Great Lakes, 513 U.S. at 534 (citations and internal quotation marks omitted). Instead, the purpose of installing the casing was to permit the jack-up rig and its crew to begin drilling for oil, an activity that could have just as easily been done, and is done, on land. Cf. Herb's Welding, 470 U.S. at 425 (noting that "[t]here is nothing inherently maritime about [building and maintaining pipelines]. The[se tasks] are also performed on land, and their nature is not significantly altered by the marine environment, particularly since exploration and development of the Continental Shelf are not themselves maritime commerce").

Therefore the general character of this incident appears to be non-maritime in nature. See Sisson, 497 U.S. at 363.

c. Removal of an OCSLA action

In this case and others, however, the question of whether maritime law applies is not always conclusively answered at the removal stage of a lawsuit. There may be insufficient factual development at that time to determine either the cause of the incident or the general character of the activity giving rise to it. With this in mind, we note that we need not definitively determine whether maritime or Texas law applies to this lawsuit, because under either theory, removal was proper.

Although we do not decide whether maritime law applies to this suit, we acknowledge that when maritime law applies under OCSLA, maritime law will displace the application of federal law and any supplemental state law. Tenn. Gas, 87 F.3d at 154 ("While OCSLA was intended to apply to the full range of disputes that might occur on the OCS, it was not intended to displace general

maritime law."); Smith, 960 F.2d at 459 ("When an event occurs on an OCSLA situs but also is governed by maritime law, maritime law controls."). This overlap has caused some confusion among courts considering removal of OCSLA claims in which maritime law provides the substantive rule of decision, because even though federal courts have original jurisdiction over maritime claims under 28 U.S.C. § 1333, they do not have removal jurisdiction over maritime cases which are brought in state court. Romero v. Int'l Terminal Operating Co., 358 U.S. 354, 377-79 (1959). Instead, such lawsuits are exempt from removal by the "saving-to-suitors" clause of the jurisdictional statute governing admiralty claims, see id., and therefore may only be removed when original jurisdiction is based on another jurisdictional grant, such as diversity of citizenship. In re Dutile, 935 F.2d 61, 63 (5th Cir. 1991).

The question before this court is whether maritime law, when it provides the substantive rule of decision under OCSLA, abrogates OCSLA's grant of federal question jurisdiction and prohibits removal of an action filed in state court absent complete diversity. Two previous panels of this circuit have recognized the "conundrum" posed by the removal of OCSLA claims when general maritime law provides the substantive law of decision. However, both panels declined to rule on this issue, instead finding the cases removable on other grounds. Hufnagel, 182 F.3d at 351 (holding that the claim at issue was non-maritime in nature); Tenn. Gas, 87 F.3d at 156 (holding that "removal is consistent with the second sentence of § 1441(b), if not the first").

In the absence of guidance from this court, district courts have fallen on both sides of this issue. Some district courts have held that when maritime law applies to an OCSLA claim, maritime law will deprive that suit of original federal question jurisdiction under § 1441(a). See, e.g., Courts v. Accu-Coat Servs., Inc., 948 F. Supp. 592, 595 (W.D. La. 1996) ("There is no concrete evidence that Congress intended to supersede the language of § 1441 or have the

federal courts ignore the parties' citizenship when it granted broad jurisdiction under the OCSLA. . . . Based on the foregoing, the Court finds that independent federal question jurisdiction does not exist."); Walsh, 836 F. Supp. at 417 ("[T]he sole question for this Court is a choice of law question: whether Walsh's claim of 'negligence' against the operator of a drilling vessel on the OCS is necessarily an action 'arising under' the laws of the United States, or simply one arising under the general maritime law.  Because the answer is the latter, Walsh has not pled a cause on which Seagull may base removal."); Fogleman v. Tidewater Barges, Inc., 747 F. Supp. 348, 355-56 (E.D. La. 1990) ("The only possible . . . basis upon which the defendants would have this Court exercise jurisdiction is under OCSLA.  However . . . in the instant case, OCSLA cannot be a basis for federal question removal because the case necessarily has a maritime character.").

Other district courts, however, have recognized that "the question of subject matter jurisdiction is entirely independent of choice of law analysis." Broussard v. John E. Graham & Sons, 798 F. Supp. 370, 373 (M.D. La. 1992). As this circuit has acknowledged, "the decision to apply maritime law . . . has nothing to do with whether or not a federal court has jurisdiction."  Dahlen v. Gulf Crews, Inc., 281 F.3d 487, 492 (5th Cir. 2002).  Rather, "[t]he sole question . . . is whether OCSLA invests [a court] with original federal jurisdiction . . . [and t]he fact that [a] case may be governed by the substantive principles of general maritime law does not dictate remand."  Fallon v. Oxy USA, Inc., No. 2049, 2000 WL 1285397, at *3 (E.D. La. Sept. 12, 2000).

We find the second line of cases to more accurately describe the case law in this circuit.  Maritime law, when it applies under OCSLA, displaces federal law only as to the substantive law of decision and has no effect on the removal of an OCSLA action.  See Dahlen, 281 F.3d at 492.  As will be explained below, we base this holding on reasoning from three previous panels of this court, as well as a straightforward reading of the OCLSA statute.

As a primary matter, this court has emphasized that "the saving to suitors" clause under general maritime law "does not guarantee [plaintiffs] a nonfederal forum, or limit the right of defendants to remove such actions to federal court where there exists some basis for federal jurisdiction other than admiralty." Tenn. Gas, 87 F.3d at 153 (emphasis in original). Instead, removal of maritime cases is permissible as long as there is an independent basis for federal jurisdiction. See id. Second, federal courts retain their original federal question jurisdiction under OCSLA even when maritime law eventually provides the substantive rule of decision. Recar, 853 F.2d at 369 (holding that a federal court "may well have both admiralty jurisdiction under the general maritime law and federal question jurisdiction by virtue of OCSLA."). This means that maritime law will not supplant OCSLA's grant of federal question jurisdiction, but that both maritime jurisdiction and OCSLA jurisdiction may exist side-by-side. Third, following this precedent, we have recognized that OCSLA provides a "basis for federal jurisdiction other than admiralty," which may permit removal even when maritime law provides the substantive rule of decision. See, e.g, Morris v. T.E. Marine Corp., 344 F.3d 439, 444 (5th Cir. 2003); Dahlen, 281 F.3d at 492.[6] Therefore, the application of maritime law does not displace OCSLA's grant of federal question jurisdiction.

This conclusion is bolstered by the structure of OCSLA itself. Because OCSLA's jurisdictional provisions are independent from the sections outlining the applicable law, "the application of the law selected by the choice-of-law analysis [was not intended to] affect the independent basis for federal jurisdiction conferred by the OCSLA." Kenneth G. Engerrand, Primer of

---

[6] Both Morris and Dahlen are ultimately distinguishable from this case, although both cases permitted removal. In Morris the Defendant was not a citizen of the state in which the action was brought, so there was no question as to whether 28 U.S.C. § 1441(b) barred removal, a matter which will be discussed below. In Dahlen maritime law was found not to apply. However, the dictates of both cases provide strong support for our holding today.

17

Remedies on the Outer Continental Shelf, 4 LOYOLA MAR. L.J. 19, 25 (2005); see also 43 U.S.C. §§ 1333(a)(1)-(2). Instead, choice of law and the evaluation of subject-matter jurisdiction under OCSLA involve two distinct inquiries. See generally Morrison v. Nat'l Austl. Bank Ltd., 130 S. Ct. 2869, 2877 (2010); Hartford Fire Ins. Co. v. California, 509 U.S. 764, 812 (1993) (Scalia, J., dissenting) (discussing the distinction between federal subject matter jurisdiction and choice of law). More importantly, however, OCSLA explicitly provides that district courts have federal question jurisdiction over claims occurring on the Outer Continental Shelf. 43 U.S.C. § 1333(a)(1). Thus, even though maritime cases are exempted by statute from original question jurisdiction under § 1441(a), Romero, 358 U.S. at 377-79, OCSLA statutorily restores federal question jurisdiction over these claims even when they apply maritime law as the substantive law of decision.

The reasoning employed by the district courts in Courts, Walsh, and Fogelman is not necessarily to the contrary. These cases primarily rely on the cases of Smith v. Penrod Drilling and Laredo Offshore Constructors v. Hunt Oil, where we stated that "where admiralty and OCSLA jurisdiction overlap, the case is governed by maritime law." Laredo, 754 F.2d at 1229; accord Smith, 960 F.2d at 459. However, in Laredo, the court rejected petitioner's claim that admiralty law should apply to the action, holding that "the case is governed solely by the OCSLA and the [state] law incorporated by reference thereunder." Laredo, 754 F.2d at 1229. And in Smith, the only question presented to the panel was whether maritime law provided the substantive rule of decision, not whether removal was proper. 960 F.2d at 459-61. Thus, neither Laredo nor Smith stands for the proposition that maritime law will displace OCLSA's explicit grant of federal question jurisdiction to bar removal where it applies.

Furthermore, to the extent that we can reconcile our precedent with the legislative history of OCSLA, we must recognize that "[g]iven the national

interests that prompted Congress to pass OCSLA and grant broad jurisdiction under 43 U.S.C. § 1349, Congress arguably intended to vest the federal courts with the power to hear any case involving the OCS, even on removal, without regard to citizenship." Tenn. Gas., 87 F.3d at 156. Following this understanding, we hold today that the application of maritime law as the rule of decision does not displace OCSLA's grant of federal question jurisdiction; 28 U.S.C. § 1331 provides original federal question jurisdiction over this claim because it "aris[es] under the . . . laws of the United States;" Recar, 853 F.2d at 370, and therefore removal of this action was proper regardless of the citizenship of the parties. See 28 U.S.C. § 1441(b) (2011) (holding that [a]ny civil action of which the district courts have original jurisdiction founded on a claim or right arising under the . . . laws of the United States shall be removable without regard to the citizenship or residence of the parties.").

     d.     The effect of the parties' citizenship on removal

Although OCSLA provides courts with original federal question jurisdiction under § 1331, Barker nevertheless argues that this suit was improperly removed because Defendants are citizens of the state in which the action was brought. In other words, Barker urges this court to hold that when maritime law provides the substantive rule of decision under OCSLA, the "home-state defendant" rule must also be satisfied before an action may be removed. See 28 U.S.C. § 1441(b) (2011); see also 28 U.S.C. § 1441(b)(2). Barker's suggestion is contrary to both the letter and spirit of the removal statute, especially as it has been recently clarified by Congress.

At the time that this action was removed, the federal removal statute provided that:

> Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action

shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

28 U.S.C. § 1441(b) (2011) (emphasis added). Barker contends that although original federal question jurisdiction is present in this action, this is not a case in which original jurisdiction is "founded on a claim or right arising under the . . . laws of the United States," because maritime law provides the substantive rule of decision. He argues that this claim instead falls into the category of "any other such action" in which removal is only proper if "none of the . . . defendants is a citizen of the State in which such action is brought." Id.

For Barker's argument to be successful, the phrase "any other such action" must apply not only to diversity actions, but also to certain actions over which district courts would have had original jurisdiction under § 1441(a), but for which jurisdiction is not "founded on a claim or right arising under the laws of the United States." The only type of jurisdiction that could arguably satisfy that standard in this case is admiralty jurisdiction. See Dutile, 935 F.2d at 63 (noting that the words of the arising under statute "do not extend, and could not reasonably be interpreted to extend, to cases of admiralty and maritime jurisdiction." (quoting Romero, 358 U.S. at 378)).[7] Federal question jurisdiction is not implicated by the second sentence of § 1441(b) because federal question jurisdiction is, simply put, founded on a claim or right "arising . . . under the laws . . . of the United States," 28 U.S.C. § 1331, and therefore expressly excluded from application of the home-state defendant rule.[8]

---

[7] Note that "[t]he practical effect of these provisions is to prevent the removal of admiralty claims pursuant to § 1441(a) unless there is complete diversity of citizenship. . . . [and thus a] defendant who desires to remove a maritime action from state court to federal court must establish diversity jurisdiction." Dutile, 935 F.2d at 63.

[8] Previous panels of this court have contemplated, but not held, that OCSLA claims applying maritime law are not removable absent satisfaction of the home-state defendant rule. See, e.g., Morris, 344 F.3d at 444; Hufnagel, 182 F.3d at 350. Following this

However, admiralty jurisdiction is not present in this suit because Barker filed in state court, therefore invoking the saving-to-suitors exception to original admiralty jurisdiction. See 28 U.S.C. § 1333; Romero, 358 U.S. at 378. Instead, for the reasons discussed above, jurisdiction in this suit is premised on—and only on—federal question jurisdiction under OCSLA. Because federal question jurisdiction is present under OCSLA, and because we hold today that maritime law does not supplant that grant of federal question jurisdiction, it follows that this action is removable "without regard to the citizenship or residence of the parties" under § 1441(b) (2011).

This interpretation is especially persuasive in light of Congress's recent clarification of 28 U.S.C. § 1441(b). Instead of the amorphous dictate that "[a]ny other such action shall be removable only if none of the . . . defendants is a citizen of the State in which such action is brought," the statute now explicitly specifies that a "civil action otherwise removable solely on the basis of [diversity jurisdiction] may not be removed if any of the . . . defendants is a citizen of the State in which such action is brought." § 1441(b)(2) (emphasis added); accord H.R. REP. NO. 112-10 (explaining that the updated version is a clarification, as opposed to an amendment, of the original statute). Thus, it is clear that the citizenship requirement in § 1441(b) only applies when a case is removed on the

---

precedent, some have argued that although such claims "aris[e] under the . . . laws of the United States" by virtue of OCSLA's jurisdictional grant, they are not "founded . . . on the laws of the United States," when maritime law provides the substantive rule of decision. However, the relevant inquiry is not necessarily whether the cause of action is founded on the laws of the United States, but whether "original jurisdiction [is] founded on a claim or right arising under the . . . laws of the United States." § 1441(b) (2011). See, e.g., Tenn. Gas, 87 F.3d at 153 (noting that "maritime claims do not 'aris[e] under the . . . laws of the United States' for purposes of federal question and removal jurisdiction." (quoting 28 U.S.C. § 1441(b) (2011)) (emphasis added)); accord Dutile, 935 F.2d at 62-63. Pursuant to our holding today, federal courts have original jurisdiction over OCSLA claims because they "aris[e] under the . . . laws of the United States," 28 U.S.C. § 1441(b) (2011); see also Recar, 853 F.2d at 370, and this jurisdictional grant is not superseded by maritime law, even when maritime law provides the substantive rule of decision. Accordingly, we find that the parties need not satisfy the home-state defendant rule in order to remove this OCSLA action.

21

basis of diversity jurisdiction. Although cases invoking admiralty jurisdiction under 28 U.S.C. § 1333 may require complete diversity prior to removal, Dutile, 935 F.2d at 63, the same is not true for OCSLA claims in which maritime law provides the substantive rule of decision, because these claims are removable under federal original question jurisdiction for the reasons discussed above.

This holding is also consistent with the purpose of § 1441(b). There is no reason why, in the absence of a requirement of diversity jurisdiction, removal should be limited based on the citizenship of a defendant. OCSLA provides that defendants anywhere are entitled to a federal forum for their claims, not because of a risk that they might be "home-towned" but out of a concern for a uniform application of the law governing the OCS. See Engerrand, Primer of Remedies on the Outer Continental Shelf. Accordingly, Defendants' removal of this suit was proper, and the district court's order denying remand is AFFIRMED.

II.    Summary Judgment

Because we have not decided whether Texas or maritime law applies to this dispute, we can only affirm the district court's grant of summary judgment if there is no genuine issue of material fact under either theory. For the reasons stated below, we find that there is none.

a.    Texas law

As a primary matter, Barker's cause of action against Hall-Houston for negligence is barred by Chapter 95 of the Texas Civil Practices and Remedies Code, which limits the liability of property owners in personal injury actions brought by independent contractors when the claims "arise[] from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement." TEX. CIV. PRAC. & REM. CODE § 95.002. When a contractor or subcontractor files a suit against a property owner for negligence, the property owner will not be liable unless the plaintiff can satisfy both conditions of Section 95.003, which require the plaintiff

to show that the property owner (1) exercised or retained "some control over the manner in which the work is performed" and (2) had "actual knowledge of the danger or condition resulting in personal injury, death, or property damage," yet "failed to adequately warn" of that danger. Id. § 95.003; see also Francis v. Coastal Oil & Gas Corp., 130 S.W.3d 76, 84 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

It is undisputed that Hall-Houston was the owner of the mineral lease at issue, and that the well on which Barker and Broussard were working constituted an "improvement" to this property, sufficient to trigger application of Chapter 95. Francis, 130 S.W.3d at 84. Barker presented no evidence that Hall-Houston either exercised control over his work, or had actual knowledge of any dangerous condition on the rig, as required by the statute. Barker did not have a direct contract with Hall-Houston at the time of the accident, and the mere presence of a representative on site to observe an independent contractor's work does not evidence control. Koch Ref. Co. v. Chapa, 11 S.W.3d 153, 157 (Tex. 1999). Accordingly, Barker's negligence claims against Hall-Houston are barred by the Texas Civil Practices and Remedies Code.

As to Barker's claims against both defendants, Barker cannot recover for negligent infliction of emotional distress because Texas does not recognize a cause of action under this theory. Twyman v. Twyman, 855 S.W.2d 619, 621 (Tex. 1993). Nor can Barker recover under a theory of bystander recovery, as Texas courts have limited this cause of action to incidents involving close family members. Rodriguez v. Motor Express, Inc., 909 S.W.2d 521, 525 (Tex. App.—Corpus Christie 1995) rev'd on other grounds, 925 S.W.2d 638 (Tex. 1996). Therefore, Barker cannot sustain a claim under Texas law against either Defendant.

b. Maritime law

Because Barker does not allege that he suffered any physical injury as a direct result of the incident, he may only recover under maritime law if he can show that (a) the "zone of danger" theory applies to allow recovery for purely emotional injuries in non-Jones Act cases, and (b) he satisfies the requirements of that theory.

Under maritime law, a bystander cannot recover merely for witnessing harm to another where the bystander suffered no harm or threat of harm. Gaston v. Flowers Transp., 866 F.2d 816, 818-20 (5th Cir. 1989). However, this court has left open "the question whether a [bystander] may recover for purely emotional injuries under a zone of danger theory" at maritime law. Plaisance v. Texaco, Inc., 966 F.2d 166, 169 (5th Cir. 1992) (en banc); accord Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 557 (1994) (adopting this theory in Jones Act cases). Although some circuits have adopted the zone of danger test for non-Jones Act maritime claims, Chan v. Soc'y Expeditions, Inc., 39 F.3d 1398 (9th Cir. 1994); see also Chaparro v. Carnival Corp., 693 F.3d 1333, 1338 (11th Cir. 2012 (per curiam) (noting that "but federal maritime law has adopted Gottshall''s application of the 'zone of danger' test"), this circuit and others have "yet to recognize recovery under the zone of danger rule" for general maritime claims. Genie-Lyn Ltd. v. Del. Marine Operators, Inc., No. 50, 2006 WL 42169, at *24 n.36 (W.D. La. Jan. 3, 2006) (quoting Ainsworth v. Penrod Drilling Corp., 972 F.2d 546, 548 (5th Cir. 1992)).

We need not decide today whether the zone of danger theory applies to non-Jones act maritime claims, because even if it were to apply, Barker could not satisfy the requirements of that theory as a matter of law. We agree with the district court that Barker was not in "immediate risk of physical harm" as required by the theory, Gottshall, 512 U.S. at 548, because at the time of the incident he was standing two feet away from the opening in the rig's drill floor. Barker specifically testified that he was sanding "on solid ground [which] was

not going to fall," and by the time the pan fell, Barker was "out of the dangerous position where something could have happened . . . if the pan had been cut." In fact, Barker had his back turned to the opening at the time of the incident, and only became aware of it after he heard a noise behind him. Barker further testified that his initial "reaction was not that [he] was scared that [he] was going to fall," but that he should make sure that his co-workers were safe. Because Barker does not allege any facts which would place him in immediate risk of physical harm, the zone of danger theory is inapplicable. See id. at 548.

c.     LHWCA

If Texas law applies to this action, Barker cannot maintain a cause of action under the LHWCA, as that statute only applies where maritime law applies. May v. Transworld Drilling Co., 786 F.2d 1261, 1264 (5th Cir. 1986). If maritime law applies to this action, then the LHWCA is incorporated through OCSLA and may be actionable under the provisions of that Act. 43 U.S.C. § 1333(b). However, Barker is not entitled to recover under LHWCA for the same reason that he cannot recover under the bystander rule under general maritime law. See Dierker v. Gypsum Transp., Ltd. 606 F. Supp. 566, 567-69 (E.D. La. 1985) (discussing the non-recoverability of bystander injuries under LHWCA). Therefore, for the reasons stated above, Barker cannot maintain a cause of action under the LHWCA, and summary judgment for the Defendants on all counts is AFFIRMED.

CONCLUSION

This suit was properly removed to federal court under OCSLA's grant of original federal question jurisdiction, regardless of whether maritime law provides the substantive rule of decision, and regardless of the citizenship of the parties. Because Barker cannot show a genuine issue of material fact with respect to his claims under either Texas or maritime law, the district court's

orders denying remand and granting summary judgment to Defendants are AFFIRMED.

HIGGINBOTHAM, Circuit Judge, dissenting:

I write separately because I find it clear that maritime law applies to Barker's action against Hercules Offshore and Hall-Houston. As such, my analysis of both the motion to remand and the motion for summary judgment differs from that proposed by the majority.

## I. CHOICE OF LAW

Judge Clement's concurrence expresses doubt as to whether maritime law applies to Barker's action, concluding that even though a jack-up rig is a vessel, "the general character of the incident appears to be non-maritime in nature." Although Judge Clement does not "definitively determine" whether maritime law or Texas law applies to this lawsuit, because under either theory it contends removal was proper, I respond to the uncertainty her approach brings to settled law.

At the outset, we do agree on the basic premises surrounding the choice of law analysis, and those principles are well-established by this Circuit's precedent: Even when the OCSLA's choice of law provision applies, adjacent state law does not apply as surrogate federal law if maritime law applies of its own force.[1] And, in order for maritime law to apply of its own force, there must be both a maritime location and a connection to a traditional maritime activity.[2] Specifically, as explained by the Supreme Court in Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., the following test should be used to determine whether maritime law applies:

---

[1] Union Tex. Petroleum Corp. v. PLT Eng'g, Inc., 895 F.2d 1043, 1047 (5th Cir. 1990).

[2] Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995); Foremost Ins. Co. v. Richardson, 457 U.S. 668, 673–74 (1982); Hufnagel v. Omega Serv. Indus., Inc., 182 F.3d 340, 351 (5th Cir. 1999).

A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection test raises two issues. A court, first, must "assess the general features of the type of incident involved" to determine whether the incident has "a potentially disruptive impact on maritime commerce." Second, a court must determine whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity."[3]

I find that test satisfied in this case.

The location test is easily satisfied here because the alleged tort occurred on navigable water. My main departure from Judge Clement's concurrence comes in its analysis of the second prong of the Grubart test—whether the claim has a connection with maritime activity.

Under the first prong of the connection inquiry, we ask whether the incident has "a potentially disruptive impact on maritime commerce."[4] In answering that question, we look "to potential effects, not to the 'particular facts of the incident' . . . focus[ing] not on the specific facts at hand but on whether the 'general features' of the incident were 'likely to disrupt commercial activity.'"[5] Importantly, in conducting its analysis, the Grubart Court looked to "the 'general features' of the incident at issue," not at the activity being undertaken at the time of the accident.[6] Thus, although Barker and Broussard were running casing over a well, the relevant "incident" upon which the disruption analysis should be conducted is the fall of the pollution pan from the jack-up rig (a vessel). "So characterized, there is little question that this is the kind of incident

---

[3] Grubart, 513 U.S. at 534 (quoting Sisson v. Ruby, 497 U.S. 358, 363–65 (1990)).

[4] Id. (quoting Sisson, 497 U.S. at 364 n.2).

[5] Id. at 538 (quoting Sisson, 497 U.S. at 363).

[6] Id. (quoting Sisson, 497 U.S. at 363).

28

that has a 'potentially disruptive impact on maritime commerce.'"[7] As we explained in Coats v. Pernod Drilling Corp., a case involving an injury to a worker on a jack-up rig, "worker injuries . . . can have a disruptive impact on maritime commerce by stalling or delaying the primary activity of a vessel."[8]

I realize that Coats involved an injury sustained while repairing and maintaining a jack-up rig that was located in port, while this case involves an injury sustained while conducting casing operations on a jack-up rig with its legs extended into the seabed of the outer Continental Shelf. But that distinction does not undermine our rationale for finding a potentially disruptive impact in Coats—that "worker injuries . . . can have a disruptive impact on maritime commerce by stalling or delaying the primary activity on the vessel."[9] That reasoning rests not on the particular task the worker is completing at the time of his injury but instead on the delay in vessel operations inherent in dealing with a worker's injury or death. I find support for that reading in the Supreme Court's articulation of the "potentially disruptive impact on maritime commerce" standard in Sisson v. Ruby.[10] That case involved a fire on a noncommercial vessel docked at a marina on a navigable waterway. The Supreme Court found that "such a fire has a potentially disruptive impact on maritime commerce, as it can spread to nearby commercial vessels or make the marina inaccessible to such vessels."[11] After so finding, the Supreme Court clarified that the "potentially disruptive impact" inquiry does not "turn on the particular facts of the incident in this case, such as the source of the fire or the specific location of

_____

[7] Id. at 539.

[8] 61 F.3d 1113, 1119 (5th Cir. 1995) (en banc).

[9] Id.

[10] 497 U.S. 358 (1990).

[11] Id. at 362.

the yacht at the marina, that may have rendered the fire . . . more or less likely to disrupt commercial activity."[12]

Moreover, it is immaterial whether the accident in this case actually caused such a delay in maritime commerce. As the Supreme Court explained in Sisson, the inquiry focuses on whether the incident had a potentially disruptive impact on maritime commerce:

> We determine the potential impact of a given type of incident by examining its general character. The jurisdictional inquiry does not turn on the actual effect on maritime commerce of the fire . . . . Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity.[13]

Thus, I would find that the incident here had a "potentially disruptive impact on maritime commerce," satisfying the first prong of Grubart's connection inquiry.[14]

Turning to the second prong of the connection inquiry, we "must determine whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'"[15] This inquiry turns on "whether a tortfeasor's activity, commercial or uncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at

---

[12] Id. at 363.

[13] Id. (emphasis in original).

[14] Judge Clement's concurrence seems to rely on the fact that offshore drilling is not maritime commerce. However, it finds support for that proposition in statements dealing with offshore drilling from a fixed platform. That analysis does not rebut the argument that accidents on jack-up drilling rigs (vessels) have a potentially disruptive impact on maritime commerce even if the jack-up rig is engaged in offshore drilling at the time of the accident.

[15] Grubart, 513 U.S. at 534 (quoting Sisson, 497 U.S. at 364–65).

hand."[16] In his complaint, Barker alleges that the Defendants failed to provide a safe workplace aboard the Hercules 251—a vessel. This Court has previously explained that "failing to provide a safe workplace aboard a vessel is a maritime tort," even when the work the plaintiff is performing is non-maritime in nature.[17] Because vessel maintenance is a traditional maritime activity, I would find the tortfeasors' activity bears a substantial relationship to a traditional maritime activity. That conclusion is only bolstered by the fact that this tort occurred aboard a vessel, and "[p]roviding compensation for shipboard injuries is a traditional function of the admiralty laws."[18]

Because the Grubart test is clearly satisfied in this case, I would find that Barker has alleged a maritime tort. It is equally clear to me that Barker's action against the vessel and the vessel-owner is cognizable under § 905(b) of the LHWCA. In § 905(b), Congress preserved the longshoremen's right to recover against the vessel-owner for negligence.[19] Because the OCSLA, specifically 43

---

[16] Id. at 539–40.

[17] Strong v. B.P. Exploration & Prod., Inc., 440 F.3d 665, 669 (5th Cir. 2006).

[18] Coats, 61 F.3d at 1119 (citing Sisson, 497 U.S. at 368–75 (Scalia, J., concurring) (arguing that all vessel-related torts fall within the admiralty jurisdiction)); see Grubart, 513 U.S. at 542–43 ("Grubart makes an additional claim that Sisson is being given too expansive a reading. If the activity at issue here is considered maritime related, it argues, then virtually 'every activity involving a vessel on navigable waters' would be 'a traditional maritime activity sufficient to invoke maritime jurisdiction.' But this is not fatal criticism. This Court has not proposed any radical alteration of the traditional criteria for invoking admiralty jurisdiction in tort cases, but has simply followed the lead of the lower federal courts in rejecting a location rule so rigid as to extend admiralty to a case involving an airplane, not a vessel, engaged in an activity far removed from anything traditionally maritime . . . . Although we agree with petitioners that these cases do not say that every tort involving a vessel on navigable waters falls within the scope of admiralty jurisdiction no matter what, they do show that ordinarily that will be so.").

[19] Scindia Navigation Co. V. Santos, 451 U.S. 156, 165 (1981).

U.S.C. § 1333(b), makes the LHWCA applicable to Barker,[20] section 905(b) by its terms preserves his action against the vessel and vessel-owner.[21]

## II. MOTION TO REMAND

At the time the action was removed to federal court, the federal removal statute provided in relevant part:

> (a) Except as otherwise provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending. For purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded.

> (b) Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.[22]

Thus, for removal to be proper, § 1441(a) required that the federal district courts have original jurisdiction over the action. Then, for certain cases, § 1441(b) imposed the additional requirement that "none of the . . . defendants is a citizen of the State in which [the] action [was] brought" (the "forum-defendant requirement"). I find removal proper here because Barker's action is one "of

---

[20] 43 U.S.C. § 1333(b); see Demette v. Falcon Drilling Co., 280 F.3d 492, 497–98 (5th Cir. 2002), overruled on other grounds, Grand Isle Shipyard v. Seacor Marine, LLC, 589 F.3d 778 (5th Cir. 2002) (en banc); Lomand v. Int'l Mooring & Maine, 845 F.2d 536, 541 (5th Cir. 1987).

[21] See Lormand, 845 F.2d at 541; Longmine v. Sea Drilling Corp., 610 F.3d 1342, 1347–52 (5th Cir. 1980).

[22] 28 U.S.C. § 1441(a), (b).

which the district courts of the United States have original jurisdiction" by virtue of the OCSLA's grant of original jurisdiction. Moreover, § 1441(b)'s forum-defendant requirement is inapplicable because the case was not removed on the basis of diversity jurisdiction.

## A. Section 1441(a)

The Defendants removed this action to the Southern District of Texas based on the OCSLA's grant of original jurisdiction. Specifically, 43 U.S.C. § 1349(b)(1) provides that "the district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with, . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf."[23]

Although maritime law applies to Barker's action, and federal courts do not have removal jurisdiction over maritime cases which are brought in state court,[24] this Circuit allows removal of a claim governed by maritime law if the claim falls within the OCSLA's grant of original jurisdiction.[25] In those cases, the OCSLA provides an independent basis of jurisdiction to make otherwise non-removable maritime claims removable.

Here, it is undisputed that the federal district courts have original jurisdiction over this action based on § 1349(b)(1) because the case arises out of an operation conducted on the outer Continental Shelf which involves development of the minerals of the subsoil and seabed of the outer Continental

---

[23] 43 U.S.C. § 1349(b)(1).

[24] Romero v. Int'l Terminal Operating Co., 358 U.S. 354, 377–79 (1959). Similarly, a § 905(b) action does not arise under a federal statute for purposes of federal question jurisdiction. Richendollar v. Diamond M, 819 F.2d 124 (5th Cir. 1987).

[25] Morris v. T.E. Marine Corp., 344 F.3d 439, 444 (5th Cir. 2003); Tennessee Gas Pipeline v. Hous. Cas. Ins., 87 F.3d 150, 153–55 (5th Cir. 1996).

Shelf.[26]  Although the OCSLA does not define the term "operation," this Court has explained that the term "refers to the doing of some physical act."[27]  43 U.S.C. § 1331 defines "development" to mean "those activities which take place following discovery of minerals in paying quantities, including . . . drilling . . . for the purpose of ultimately producing the minerals discovered."[28]  The Hercules 251 was in the process of drilling on the outer Continental Shelf at the time of the accident, and Barker and Broussard were "preparing the rig's drill floor substructure to run casing," such that they were undertaking an operation involving development of minerals of the subsoil and seabed of the outer Continental Shelf.  We have employed a but-for test to decide whether a dispute "aris[es] out of or in connection with" an operation, thus granting federal subject matter jurisdiction.[29]  Because Barker would not have been injured but for the work he was performing on the Hercules 251, his action "aris[es] out of or in connection with" an operation on the outer Continental Shelf which involves development of minerals.  Thus, his action is "a civil action . . . of which the district courts of the United States have original jurisdiction" and was properly removed by the Defendants under § 1441(a).

## B.  Section 1441(b)

I interpret § 1441(b)'s forum-defendant requirement as only applying to cases removed on the basis of diversity jurisdiction.  Because this case was

---

[26] Indeed the district court below found that the case calls within the OCSLA's jurisdictional grant, and the parties do not dispute that finding.

[27] Amoco Prod. Co. v. Sea Robin Pipeline Co., 844 F.2d 1202, 1207 (5th Cir. 1988).

[28] 43 U.S.C. § 1331(l).

[29] See, e.g., Tenn. Gas Pipeline, 87 F.3d at 155; Recar v. GNG Producing Co., 853 F.2d 367, 369 (5th Cir. 1988).

removed on the basis of the OCSLA's independent grant of federal jurisdiction, the forum-defendant requirement does not limit its removal.

As part of the Federal Courts Jurisdiction and Venue Clarification Act of 2011, Congress amended § 1441(b) to clarify that the forum-defendant requirement only applies to actions removed on the basis of diversity jurisdiction. The statute now explicitly states: "A civil action otherwise removable on the basis of jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest properly joined and served as defendant is a citizen of the State in which such action is brought."[30] The House Report accompanying the amendment explains: "Proposed paragraph 1441(b)(2) restates the substance of the last sentence of current subsection 1441(b), which relates only to diversity."[31] Based on that explanation, I view the amendment as a clarification that Congress, when it enacted § 1441(b), only intended the forum-defendant requirement to apply to cases in which removal was based on diversity; Congress did not intend the limitation to apply in other cases.[32]

Moreover, this interpretation of § 1441(b) as only applying the forum-defendant requirement to actions removed on the basis of diversity jurisdiction is consistent with the purpose of both the OCSLA's jurisdictional grant and the forum-defendant requirement. "Absent diversity . . . it simply does not make any

---

[30] 28 U.S.C. § 1441(b)(2).

[31] H.R. Rep. No. 112-10, at 12 (2011).

[32] I realize Congress provided that the amendment only applies to actions commenced on or after the expiration of the 30-day period beginning on the date of enactment (December 7, 2011). Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. 112-63, § 105, 125 Stat. 758 (2011). Congress also explained that "an action or prosecution commenced in State court and removed to Federal court shall be deemed to commence the date the action or prosecution was commenced, within the meaning of State law, in State court." Id. Because Barker filed his action in state court on January 27, 2010, the pre-amendment version of § 1441 applies. Despite the fact that the amendment to § 1441(b) does not apply retroactively, I believe that it illuminates a key aspect of congressional intent that is helpful in interpreting the applicability of § 1441(b)'s forum-defendant requirement.

sense to make removal of a saving-clause case turn on whether one of the defendants is a citizen of the forum state. The fortuity of citizenship is totally irrelevant to the policy factors germane to the removal question under discussion."[33] As this Court has previously explained, "[g]iven the national interests that prompted Congress to pass OCSLA and grant broad jurisdiction under 43 U.S.C. § 1349, Congress arguably intended to vest the federal courts with the power to hear any case involving the OCS, even on removal, without regard to citizenship."[34]

In sum, I find removal proper here because the OCSLA provides an independent basis of federal jurisdiction to make otherwise non-removable maritime claims removable, and section 1441(b)'s forum-defendant requirement does not limit removal because the case was not removed on the basis of diversity jurisdiction.

## III. MOTION FOR SUMMARY JUDGMENT

I disagree with the majority opinion's conclusion that summary judgment was proper under maritime law. To my eyes, a genuine issue of material fact exists as to whether Barker was in the zone of danger at the time of the accident, and as such I would reverse the district court's grant of summary judgment in favor of the Defendants and remand for further proceedings on the merits.

To be clear, this Circuit has not yet decided whether a plaintiff may recover under maritime law for emotional injury claims based on the "zone of danger" theory. It is true, as the majority opinion explains, that "a bystander [cannot] recover for merely witnessing harm to another where the plaintiff

---

[33] C. Wright, A. Miller, & E. Cooper, 14A Federal Practice & Procedure § 3674.

[34] Tenn. Gas, 87 F.3d at 156.

suffered no harm or threat of harm."[35]  However, this Circuit has explicitly "[left] open[] the question [of] whether a plaintiff may recover for purely emotional injuries under a zone of danger theory."[36]  Based on the Supreme Court's recent decision in Consolidated Rail Corp. v. Gottshall and other Circuits interpretations of that decision, I would hold that the zone of danger theory applies in maritime cases.  In Gottshall, the Supreme Court held that a plaintiff who brings a Jones Act claim for emotional injury unaccompanied by a physical injury may recover under a zone of danger theory.[37]  Barker urges that after Gottshall, claims for negligent infliction of emotional distress unaccompanied by physical injury are compensable under maritime law as long as the plaintiff was within the zone of danger.  I agree.  Although Gottshall did not explicitly hold that the zone of danger theory applies in non-Jones Act maritime cases for negligent infliction of emotional distress, at least two other Circuits have held that the Gottshall test, which allows plaintiffs "to recover for injuries—physical and emotional—caused by the negligent conduct of their employers that threatens them imminently with physical impact,"[38] applies in the maritime law context.[39]  I would join them.

---

[35] Plaisance v. Texaco, 966 F.2d 166, 169 (5th Cir. 1992) (en banc) (citing Gaston v. Flowers Transp., 866 F.2d 816 (5th Cir. 1989)).

[36] Id.

[37] Consol. Rail Corp. v. Gottshall, 512 U.S. 532 (1994).  To be clear, although Gottshall involved claims under FELA, because the Jones Act incorporates FELA, decisions in FELA cases are applicable to cases brought under the Jones Act.

[38] Id. at 566.

[39] See Chaparro v. Carnival Corp., 693 F.3d 1333, 1338 (11th Cir. 2012) (per curiam) (explaining that "federal maritime law has adopted Gottshall's application of the 'zone of danger' test"); Stacy v. Rederiet Otto Danielsen, 609 F.3d 1033, 1035 (9th Cir. 2010) (explaining in a maritime case that "[t]he federal standard for the negligent infliction of emotional distress is provided by Consolidated Railway Corp. v. Gottshall").

Under the zone of danger theory, summary judgment in favor of the Defendants was not proper. Contrary to the conclusion reached by the majority opinion, the evidence before the district court on summary judgment created a genuine issue of material fact as to whether Barker was threatened imminently with physical impact. Barker testified that he was standing a mere two feet from the hole when the pan fell, and that he feared he was going to fall into the hole himself. Looking at the accident, we must ask what a reasonable trier of fact might conclude. With that cast of sight, this was a man standing two feet from certain death with no protective harness, stunned at witnessing his friend cling to a beam then fall to his death. An involuntary reach out and he, too, would have died. This is the stuff of a live trial, not a paper review. He was at least arguably within the zone of danger, and the final determination of that issue should have been left with the jury.

## IV.

Today, Judge Clement brings uncertainty to the law applicable to accidents occurring on jack-up rigs. To these eyes her approach defies our precedent. Clarity of the metric in the law of the sea and its relations is especially prized as it is so much the law of insurance—define the rules and the underwriter can assess the risk and cost its distribution. I would hold that Barker has alleged a maritime tort and has created a genuine issue of material fact as to whether he was in the zone of danger at the time of the accident and reverse and remand.